**In re EUGENIA VI VENTURE HOLDINGS, LTD. LITIGATION.**

Nos. 05 Civ. 5277(DAB), 05 Civ. 5330(DAB), 05 Civ. 5635(DAB), 05 Civ. 5816(DAB), 05 Civ. 7262(DAB), 06 Civ. 2997(DAB).

United States District Court, S.D. New York.

Dec. 15, 2008.

Mitchell A. Karlan, Gibson, Dunn & Crutcher LLP, New York, NY, for Plaintiff and Counter Defendant.

Peter G. Bergmann, Cadwalader, Wickersham & Taft LLP, New York, NY, for Defendants and ThirdParty Plaintiff.

Anthony Michael Rainone, Robert K. Scheinbaum, Podvey, Meanor, Catenacci, Hildner, Cocoziello & Chattman, Newark, NJ, for ThirdParty Defendants.

### MEMORANDUM & ORDER

DEBORAH A. BATTS, District Judge.

Plaintiff Eugenia VI Venture Holdings, Ltd. ("Eugenia" or "Plaintiff") brings seven [1] related, but unconsolidated, suits:

(1) *Eugenia VI Venture Holdings, Ltd. v. Surinder Chabra, et al.*, 05 CV 5277(DAB), alleging fraud against Defendants Surinder Chabra, a/k/a "Sonny Chabra", Narinder Chabra, and Parvinder Chabra;

(2) *Eugenia VI Venture Holdings, Ltd. v. Surinder Chabra, et al.*, 05 CV 5330(DAB),

(3) *Eugenia VI Venture Holdings, Ltd. v. Robert J. Reale, et al.*, 05 CV 5816(DAB), and

(4) *Eugenia VI Venture Holdings, Ltd. v. Robert V. Glaser, et al.*, 05 CV 7262(DAB),[2] derivative actions alleging breach of fiduciary duty and aid-

1. Seven related suits remain before this Court. Two additional, once-related cases— 05 CV 5362 and 05 CV 9417—have been dismissed. Plaintiff's action in 05 CV 5362, *Eugenia VI Venture Holdings, Ltd. v. AMC Investors, LLC and AMC Investors II, LLC*, alleging breach of contract against Defendants AMC Investors, LLC and AMC Investors II, LLC, was voluntarily dismissed by Plaintiff after Defendants alleged a lack of diversity of Parties. Plaintiff subsequently brought that suit in New York State court and was awarded a judgment against Defendants AMC Investors I & II in the amount of $10,710,455.00 on July 17, 2007. (*Eugenia VI Venture Holdings, Ltd. v. AMC Investors, LLC and AMC Investors II, LLC*, Civ. No. 603193/2005)

Plaintiff voluntarily dismissed its suit in 05 CV 9417 against MapleWood Equity Partners, LP on February 21, 2008. Plaintiff has one additional open case before this Court, 05 CV 7810, *Eugenia VI Venture Holdings, Ltd. v. AMC System Integration, Inc., et al.*, an action for trademark infringement. That case is not addressed by the Court's decision today in the above-captioned actions.

2. On July 11, 2006, Plaintiff filed an Amended Consolidated Complaint (hereinafter, "Amended Consolidated Complaint")/ consolidating its derivative breach of fiduciary duty actions in 05 CV 5330, 05 CV 5816, and 05 CV 7262 only.

ing and abetting breach of fiduciary duty by Defendants Surinder Chabra a/k/a "Sonny Chabra", Narinder Chabra, Parvinder Chabra, Robert J. Reale, Robert V. Glaser, Burton C. Glosson, Glen Dell, and Ron Augustin to insolvent nominal Defendant AMC Computer Corp.;

(5) *Eugenia VI Venture Holdings, Ltd. v. AMC Computer Corp.* 05 CV 5397(DAB), alleging breach of contract against Defendant AMC Computer Corp.[3];

(6) *Eugenia VI Venture Holdings, Ltd. v. Robert J. Reale,* 05 CV 5635(DAB), alleging fraud, fraudulent inducement, and aiding and abetting fraud against Defendant Robert J. Reale; and

(7) *Eugenia VI Venture Holdings, Ltd. v. Robert V. Glaser, et al.,* 06 CV 2997(DAB), alleging fraud, fraudulent inducement, and aiding and abetting fraud against Defendant Robert V. Glaser.

Each of these suits arises out of facts surrounding an Amended and Restated Credit Agreement (the "Credit Agreement" or "Agreement") between Eugenia and AMC Computer Corp. dated January 30, 2003,[4] pursuant to which Plaintiff agreed to lend up to $16,000,000 to AMC Computer Corp. and its New Jersey subsidiary ("AMC"). The Credit Agreement provided for two distinct loans: a $3,000,000 term loan ("Term Loan"), fully funded at the Agreement's closing, and a

$13,000,000 revolving line of credit ("Revolver Loan"). The amount that AMC could borrow under the Revolver Loan was dependent at all relevant times upon the value of the company's inventory, accounts receivable, and the proceeds thereof (the "Collateral"), and capped at 85% of AMC's eligible accounts receivable. To substantiate its requests for credit under the Revolver Loan, AMC submitted bi-weekly requests to Plaintiff in the form of "borrowing base certificates" ("BBCs"), in which AMC represented the value of its current "eligible" accounts receivable, as defined by Parties in the Credit Agreement. Between January 2003 and May 2005, when Plaintiff declared AMC in default of the Agreement, AMC submitted approximately 225 BBCs to Plaintiff, drawing funds from Plaintiff totaling $136,429,501.

In its related suits before the Court, Plaintiff asserts claims of fraud and derivative claims of breach of fiduciary duty—the latter on behalf of AMC—against individual Defendants alleged to have been directors, "de facto director," and majority shareholder of AMC. Plaintiff alleges fraudulent inducement, fraud, and aiding and abetting fraud [05 CV 5635 and 06 CV 2997] against Defendants Robert J. Reale ("Reale"), Vice Chairman of AMC's Board of Directors and Chair of its Audit Committee, and Robert V. Glaser ("Glaser"), who Plaintiff alleges to have been "de facto" Chairman of AMC's Board. Plaintiff

---

**3.** AMC Computer Corp., Defendant to Plaintiff's breach of contract action in 05 CV 5397, is not a party to the instant Joint Motion for Summary Judgment and Motion to Strike, and the Motion does not challenge the claims Plaintiff has asserted in that action. Defendant AMC Computer Corp. failed to answer Plaintiff's Complaint in 05 CV 5397, and the Clerk of Court entered default against it. In an Order dated December 28, 2005, Judge Denny Chin, to whom the related cases were

initially assigned, declined to enter Default Judgment in 05 CV 5397 against AMC until all claims against the Defendants in the other cases were resolved. The case is not addressed by the Court's decision today.

**4.** The January 30, 2003 Credit Agreement superseded a smaller 2001 loan agreement between Plaintiff and AMC.

alleges that these Defendants fraudulently induced Plaintiff to execute the Credit Agreement with AMC by making false, material statements of fact, and by intentionally concealing material facts about AMC's financial situation and history. Once the Agreement progressed, Plaintiff alleges that Defendants Reale and Glaser perpetrated, aided, and abetted fraud against Plaintiff by assisting, condoning, and directing the false statements made by their subordinates to induce Plaintiff to lend more money to AMC than it was authorized, given its famished accounts. Plaintiff likewise claims fraud [05 CV 5277] against Defendants Surinder Chabra, Chief Executive Officer of AMC, Narinder Chabra, AMC's Senior Vice President of Operations, and Parvinder Chabra, wife of Surinder Chabra and AMC shareholder, for causing AMC to make such misrepresentations. Specifically, Plaintiff alleges that all of these Defendants led AMC to misrepresent repeatedly and materially the size of its accounts receivable to induce Plaintiff to lend AMC more money than the true value of its Collateral would have permitted under the terms of the Revolver Loan. For each of its fraud claims, Plaintiff seeks compensatory and punitive damages, with interest, and attorneys' fees, costs, and disbursements in prosecuting this action.

As an AMC shareholder, Plaintiff brings a consolidated derivative action [05 CV 5816, 05 CV 5330, and 05 CV 7262] against Defendants Reale, Glaser, Surinder Chabra, Narinder Chabra, Parvinder Chabra, Ron Augustin ("Augustin"), Glen Dell ("Dell"), and Burton C. Glosson ("Glos-son") for breach of fiduciary duty and aiding and abetting breach of fiduciary duty to AMC in connection with AMC's liquidation in May 2005. Plaintiff alleges that Defendants, as members of AMC's Board of Directors, "de facto" chairman of the Board, and majority shareholder, owed fiduciary duties to AMC, and breached those duties, causing AMC to expand its debt and deepen its insolvency to its detriment and ultimate collapse. For each of its derivative breach of fiduciary duty claims, Plaintiff seeks compensatory and punitive damages, with interest, and attorneys' fees, costs, and disbursements in prosecuting the derivative action.

Now before the Court is Defendants' Joint Motion for Summary Judgment, pursuant to Fed.R.Civ.P. 56, on all of Plaintiff's fraud and derivative breach of fiduciary duty claims. In the same Motion, Defendants have moved to strike a number of claims, evidently pursuant to Fed.R.Civ.P. 12(f). Defendants' Motion to Strike is untimely.[5] However the Court may nonetheless have considered these claims in the interest of judicial economy, they are mooted by the Court's disposition of Defendants' Motion for Summary Judgment.

For the reasons stated below, Defendants' Joint Motion for Summary Judgment is GRANTED.

## I. FACTUAL BACKGROUND

### A. The Parties

Plaintiff Eugenia VI Venture Holdings, Ltd. ("Eugenia") is one of a series of relat-

---

**5.** Rule 12(f) of the Federal Rules of Civil Procedure provides as follows:

The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act:

(1) on its own; or

(2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 20 days after being served with the pleading.

Fed.R.Civ.P. 12(f). Defendants failed to move to strike before responding to Plaintiff's complaints in these actions.

ed entities owned by the Eugenia Trust, formed and founded by German billionaire Hans–Werner Hector in or about 1999. (Defs.' 56.1 Stmt.[6] ¶¶ 1, 3–4) Hector is a co-founder of SAP, AG, the computer software conglomerate, and has sat on the boards of directors of computer software and service companies Novell, Inc. and SKYVA International. (*Id.* ¶¶ 1–2) Hector formed the Eugenia Trust with his personal assets, under the laws of the Isle of Jersey. (*Id.* ¶ 3) The Eugenia Trust owns all of the stock of Plaintiff Eugenia VI Venture Holdings, Ltd. (*Id.*) The Eugenia Trust also owns 100% of the stock of a series of related entities known as Eugenia II Investment Holdings, Ltd., Eugenia III Investment Holdings, Ltd., Eugenia IV Investment Holdings, Ltd., and Eugenia V Investment Holdings, Ltd. (*Id.* ¶ 9) Hector holds a major interest in the Eugenia entities via the Eugenia Trust. (*Id.* ¶¶ 5 ("Hector, his wife, and their charitable foundation, H.W. & J. Hector Stiftung, are the sole beneficiaries of the Eugenia Trust") & 13)

Defendants Surinder Chabra ("Sonny Chabra"), Narinder Chabra, Parvinder Chabra, Robert J. Reale ("Reale"), Robert V. Glaser ("Glaser"), Ron Augustin ("Augustin"), Glen Dell ("Dell"), and Burton C. Glosson ("Glosson") were officers, directors, advisors, and/or shareholders of AMC Computer Corp. ("AMC").[7] Based in Manhattan, AMC was "an information technology professional services firm providing information technology products and related services and support." (Defs.' 56.1 Stmt. ¶ 28, quoting AMC's annual au-

dit report for the calendar year ending December 31, 2002) Defendant Sonny Chabra was AMC's Chief Executive Officer and member of the Board of Directors. (Defs.' 56.1 Stmt. ¶ 29) Defendant Narinder Chabra, Sonny's brother, was a company vice president and member of the Board. (*Id.* ¶ 42) Defendant Parvinder Chabra, Sonny's wife, was a shareholder of AMC. (*Id.* ¶ 44)

Defendant Robert V. Glaser ("Glaser") is the managing member of MapleWood Holdings, LLC, of which Defendants Dell and Reale are also members. (*Id.* ¶¶ 30 & 32) MapleWood Holdings is general partner of MapleWood Management, L.P., of which Defendants Glaser, Dell, and Reale are limited partners. (*Id.* ¶¶ 33–34) MapleWood Management provides management services to two private equity funds, MapleWood Equity Partners, L.P. and MapleWood Equity Partners (Offshore), Ltd. (collectively, the "MapleWood Funds"). (*Id.* ¶ 38) The MapleWood Funds invested in five portfolio companies, including AMC. (*Id.* ¶ 40) By March 31, 2001, the MapleWood Funds had indirectly invested $28.435 million equity in AMC. (*Id.* ¶ 41)

Defendants Sonny Chabra, Narinder Chabra, Reale, Augustin, Dell, and Glosson were members of AMC's Board of Directors at all times relevant to the present actions. (*Id.* ¶ 42) Defendant Glaser was never a member of AMC's Board of Directors, (*id.* at ¶ 43) however he attended and participated in many of its meetings and had the power to name a majority of its members as managing member of Ma-

---

**6.** Defendants have submitted a reply 56.1 Statement consolidating Defendants' and Plaintiff's 56.1 statements for the Court. Here throughout, the Court cites this reply statement—and the facts undisputed by Defendants and Plaintiff therein—as "Defs.' 56.1 Stmt." The few instances in which the Court refers specifically to Plaintiff's 56.1 Statement

("Pl.'s 56.1 Stmt.") are those in which Plaintiff has introduced additional facts or assertions in its statement that go beyond disputing or assenting to statements made by Defendants.

**7.** AMC was liquidated in May 2005.

pleWood Holdings, LLC, representing the majority of AMC's shares. (*See* Glaser Dep., 6:20–22, 54:21–55:8, 70:1–16, 115:18–25, at Karlan Decl., Ex. A; Glosson Dep., 79:17–22, at Karlan Decl., Ex. E) Defendant Parvinder Chabra was never an officer, director, or employee of AMC. (*Id.* ¶ 44)

Alongside his interest in Plaintiff Eugenia and many other investments, Hans–Werner Hector holds a significant interest in both the MapleWood entities and AMC through a complicated network of investment entities. Hector indirectly owns 99% of the limited partnership interests of an entity known as Casita, L.P. ("Casita"), which committed to invest up to $25 million in MapleWood Equity Partners (Offshore), Ltd. in April 1999. (*Id.* ¶ 45) MapleWood Equity Partners (Offshore), Ltd. has indirectly (through AMC Investors, LLC and AMC Investors II, LLC) invested $8,649,471 in AMC. (*Id.* ¶ 46) Hector's Casita entity also indirectly owns an interest in the stock of AMC via a co-investment in AMC Investors, LLC in the amount of $2.5 million. (*Id.* ¶¶ 46–47)

Eagle Advisors, Inc. ("EAI"), a Delaware corporation with its principal place of business in Manhattan, provides administrative services to the Eugenia Trust structure and each of its subsidiaries, including Plaintiff, pursuant to several service agreements. (*Id.* ¶ 12) EAI also provides performance reviews for Casita. (*Id.* ¶ 53) Hans–Werner Hector owns EAI via a chain of several entities: EAI's stock is owned by Gorey Castle, Ltd.; Eugenia IV Investment Holdings, Ltd. owns 100% of the stock of Gorey Castle, Ltd.; and Hector holds a major interest in the Eugenia entities via the Eugenia Trust. (*See id.* ¶¶ 5 & 13) The senior staff members of EAI, financial advisors to Hector, are professionals with education and experience in law, business, and finance. (*See id.* ¶¶ 15–27) Ekkehart Hassels–Weiler ("Hassels–Weiler"), the president of EAI and one of Hector's principal financial advisors, is a lawyer admitted to the German and New York bars, and has represented commercial lenders in connection with numerous loan transactions. (*Id.* ¶¶ 16 & 18) David L. Alexander ("Alexander"), senior vice president and officer of EAI, and Timothy Rogers ("Rogers"), vice president of EAI, each hold a Masters Degree in Business Administration; Alexander has occupied a number of senior positions in the field of finance. (*Id.* ¶¶ 24–26)

### B. Origins of the January 2003 Amended and Restated Credit Agreement

Eugenia, AMC (including its New Jersey subsidiary), and corporate guarantors AMC Investors, LLC and AMC Investors II, LLC, entered into the Amended and Restated Credit Agreement (the "Credit Agreement" or "Agreement") at issue in this case on January 30, 2003, under which Plaintiff agreed to lend AMC up to $16,000,000 to finance its operations.[8] The January 30, 2003 Credit Agreement superseded a smaller, $2 million revolving line of credit (the "Initial Loan") between Plaintiff and AMC, originally set to run from September 4, 2001 to March 3, 2002, and later extended until March 31, 2003. (Defs.' 56.1 Stmt. ¶¶ 55–56, 58) AMC's then-lender, General Electric Capital Corporation ("GECC"), agreed to subordinate its larger, pre-existing credit facility with AMC to the Initial Loan, to give Eugenia a first priority lien on certain forms of collateral then securing the GECC loans. (*Id.* ¶¶ 58–59) The 2003 Credit Agreement be-

---

**8.** Miller Decl., Ex. F (Credit Agreement). Only Eugenia, AMC, and the AMC Investors entities were parties to the Credit Agreement; none of the individual Defendants named in these actions signed the Agreement in his or her individual capacity. *Id.*

tween Eugenia and AMC replaced both the Initial Loan between the two entities as well as the GECC loans. (*Id.* ¶ 64)

Plaintiff Eugenia and Defendants do not dispute that prior to the January 30, 2003 loan closing between Plaintiff and AMC, Defendant Glaser informed Hector's advisor and president of EAI, Hassels–Weiler, that GECC "was going to discontinue the credit facility" with AMC, that AMC might thus be "in danger of being financially damaged and that he was unsuccessful in securing other facilities," and that "the Maplewood Fund investment [and the] co-investment would then be in danger to lose value." (*Id.* ¶ 67; Hassels–Weiler Dep., 152:7–14, at Miller Decl., Ex. C) When asked whether Eugenia "would be willing to step in as lender[ ]," Hassels–Weiler told Glaser that Plaintiff "would consider it." (Hassels–Weiler Dep., 152:15–19, at Miller Decl., Ex. C) It follows, and is undisputed, that Eugenia knew that AMC's finances were precarious before entering into the Agreement, and that "Eugenia entered into the Credit Agreement for two principal reasons—to prop up AMC and to enable Casita, L.P. to recover its co-investment via the interest and fees that Eugenia would charge AMC." (Defs.' 56.1 Stmt. ¶ 68) In an email to Glaser dated January 24, 2003, six days prior to executing the Credit Agreement, Hassels–Weiler noted that AMC was "hanging on by a thread," that the corporation's finances were "precarious," and that its margins and business prospects were declining. (*Id.* ¶ 73) In a separate email to Glaser the same day, Hassels–Weiler admitted, "We are somewhat concerned about the business plan that forms the basis of the projections. There seem to be starkly reduced expectations for 2003." (*Id.* ¶ 74) The next day, Hassels–Weiler wrote Glaser that

"The entire deal is a tour de force for both of us, I guess, given AMC's precarious financial state and outlook. Lets

[sic] hope AMC can abide by the terms of our agreement and improve its business over time, so it can find an alternate lender in a different market environment when the time is right. Until then, it seems, we are in it together, for better or worse."

(Hassels–Weiler Dep., Ex. 24, at Miller Decl., Ex. G)

Plaintiff does not dispute that before entering into the Credit Agreement, Plaintiff, through its agent, EAI, reviewed AMC's audited financial statements for the years ending December 31, 1999, 2000, and 2001, which were appended to the Credit Agreement. (Defs.' 56.1 Stmt. ¶ 90) Draft financial statements for the year ending December 31, 2002 were also appended to the Agreement. (*Id.* ¶ 91) Plaintiff's representatives at EAI also reviewed an accounts receivable aging report, budget information, and audited and unedited financial data of and concerning AMC prior to entering into the Credit Agreement. (*Id.* ¶ 92) According to the audited and unaudited financial statements produced for Plaintiff prior to the closing of the Credit Agreement, AMC's annual revenues had increased from $97,476,000 in 1999 to $113,363,000 in 2000, then decreased sharply, to $84,063,000 in 2001, and $68,489,000 in 2002. (*Id.* ¶ 93) AMC's earnings, likewise, decreased from a net profit of $4,499,000 in 1999 to a net loss of $2,562,000 in 2000, a net loss of $2,845,000 in 2001, and a net loss of $4,519,000 in 2002. (*Id.* ¶ 94) AMC's shareholder equity also dropped during this time, from $4,720,000 in 1999 to negative $27,207,000 in 2000 and negative $26,674,000 in 2001, increasing to an on-paper positive $10,468,000 in 2002 only because of the conversion, to non-voting common stock, of AMC promissory notes to Sonny Chabra. (*Id.* ¶ 95) Before closing, Plaintiff's agents and representatives were also informed, in

an "AMC Revenue/Covenant Summary" report, that AMC had "missed every revenue target in 2002" and that AMC was "in violation of its EBITDA [earnings before taxes, interest, depreciation and amortization] covenant" with GECC. (*Id.* ¶ 99) The Summary report also showed AMC was projected to have negative cash flow in 2003 totaling $619,000. (*Id.* ¶ 100)

At the time it executed the Credit Agreement with AMC, Plaintiff was aware that other lenders were reluctant to invest in technology companies in general, and in AMC in particular. (*See* Hassels–Weiler Dep. 237:8–19, at Miller Decl., Ex. C (Hassels–Weiler "believe[d] it would be difficult to find financing for AMC" because "[i]n January 2003 ... the economy was generally considered to be in contraction, certainly the technology business was, and lenders would tend to look at technology businesses of the small size such as AMC with a lot more skepticism."); Defs.' 56.1 Stmt. ¶ 87 ("Hassels–Weiler caused Eugenia to enter into the Credit Agreement despite knowing that 'AMC [was] a company who had no other lenders available at the time. It [was] a company that was small, it was in a difficult business, and was strapped for cash.")) Hassels–Weiler also knew that GECC had placed restrictions on AMC's ability to draw down on its line of credit.[9] (*Id.* ¶ 96)

### C. *Terms of the Credit Agreement*

The January 30, 2003 Credit Agreement between Eugenia and AMC provided for a three-year term ending January 31, 2006, and two distinct loans from Plaintiff to AMC: a $3,000,000 term loan ("Term Loan"), fully funded to AMC at the closing of the Agreement, and a $13,000,000 revolving line of credit ("Revolver Loan"), which was secured by a first priority lien on AMC's personal property, including its inventory, accounts receivable, and the proceeds thereof (the "Collateral"). (Defs.' 56.1 Stmt. ¶¶ 104–105, 107, 109; Miller Decl., Ex. F. (Credit Agreement)) AMC applied funds that it borrowed under the Credit Agreement to pay off its existing loan facility with GECC, which had provided for a $3 million term loan to AMC, and a $17 million revolving line of credit. (Defs.' 56.1 Stmt. ¶ 111) Whereas the GECC term loan had charged AMC interest at a floating rate tagged to The Wall Street Journal's published rate and adding 1.5%, and GECC's revolving line of credit with AMC carried an interest rate that was the Journal's base rate plus 1.25%, (*id.* ¶ 112) the Credit Agreement with Eugenia required AMC to pay interest rates much higher than the Journal's published rates. While the Journal's published prime interest rate as of the closing of the Credit Agreement was 4.5%, Eugenia charged AMC 9% interest on the Term Loan and 12% on the Revolver Loan under the Agreement. (*Id.* ¶¶ 113–114) Under the GECC loan requirements, based on a 4.5% Journal rate, GECC's term loan would have borne interest at 6%, and its revolving line of credit at 5.75%. (*Id.* ¶ 113) Under the Credit Agreement, Eugenia required AMC to pay an additional interest charge on the Revolver Loan in the amount of 4%, payable in AMC Series D Preferred Stock, which the parties referred to as payment-in-kind interest. (*Id.* ¶ 116) The Credit Agreement further provided that, upon a default by AMC, a 2% default rate of interest would apply. (*Id.* ¶ 115) Hassels–Weiler explained that

9. However Plaintiff alleges that Defendant Glaser "made numerous fraudulent misrepresentations regarding GECC, including the true reasons why GECC wanted to discontinue its loan to AMC" (Pl.'s 56.1 Stmt. ¶ 67) and regarding the restrictions GECC had placed on AMC's line of credit, (*Id.* ¶ 96) Plaintiff has produced no evidence, and refers the Court to no relevant material facts to support these claims.

Eugenia charged AMC these interest rates under the Credit Agreement because of AMC's weak finances:

> "I know that AMC is a company who had no other lenders available at the time. It is a company that was small, it was in a difficult business, and it was strapped for cash. Any company like that would have to pay interest rates and loan fees of the kind that the Eugenia loan contained."

(*Id.* ¶ 117)

Under the Credit Agreement's Revolver Loan, Plaintiff permitted AMC to borrow funds totaling up to 85% of AMC's eligible accounts receivable, to a $13,000,000 ceiling.[10] To generate and substantiate its bi-weekly credit requests, AMC was to submit "borrowing base certificates" ("BBCs") in a form agreed upon by Parties in the Credit Agreement. The Agreement defined which accounts were "eligible" to be included in the BBCs, and explicitly excluded other accounts as ineligible. (Credit Agreement, § 1.6, at Miller Decl., Ex. F) Among other enumerated exclusions, the Credit Agreement explicitly excluded as ineligible any account that "represents a progress billing," "with respect to which an invoice has not been sent to the applicable Account Debtor," or "remains unpaid for more than sixty (60) days after the due date specified in the original invoice, or for more than ninety (90) days after the original invoice date if no date was specified." (*Id.*) However, Plaintiff had discretion under the Agreement, "at any time and from time to time after the Closing Date, to adjust any of the criteria set forth" as ineligible accounts, and to "establish new

criteria with respect to Eligible Accounts." (*Id.*) For each transaction for which Eugenia advanced credit to AMC on the basis of an account represented as "Eligible" in the BBCs, AMC was required to deposit the customer payment into a "lockbox" that the Parties established with a third party, in order to pay off its debt to Plaintiff. (Defs.' 56.1 Stmt. ¶ 128)

Under the Credit Agreement, AMC was required to provide Plaintiff with annual audited financial statements prepared by a nationally recognized accounting firm, (*id.* ¶ 130) and to pay any costs and expenses incurred by Plaintiff in conducting up to two discretionary field examinations of AMC's collateral each year. (*Id.* ¶ 159; Credit Agreement, § 1.9(a)(iii), at Miller Decl., Ex. F) Plaintiff also maintained rights under the Credit Agreement to, "as frequently as [Plaintiff] reasonably determine[d] to be appropriate," have "access to [AMC's] properties, facilities, advisors and employees (including officers) . . . and to the Collateral," "to inspect, audit, and make extracts from [AMC's] books and records, and . . . to inspect, review, evaluate and make test verifications and counts of the Accounts, Inventory and other Collateral." (Credit Agreement, § 1.14 (Access), at Miller Decl., Ex. F) These rights were shared, and could be exercised, by Plaintiff's officers, employees and agents. (*Id.*)

D. *Activity Under the Credit Agreement, and Eugenia's Declaration of Default Against AMC*

EAI administered the Credit Agreement on behalf of Eugenia. (Defs.' 56.1 Stmt.

**10.** Specifically, the Credit Agreement defined the Borrowing Base as "an amount equal to the sum [as of any date of determination by Lender] of (i) 85% of the book value of Borrower's Eligible Accounts; plus (ii) 60% of the book value of Borrower's Eligible Inventory valued at the lower of cost (determined on a first in, first out basis) or market; minus (iii) any Reserves established by Lender at such time." (Credit Agreement, Annex A (Definitions), at Miller Decl., Ex. F) Because Plaintiff's fraud claims surround Defendants' representations of AMC's accounts receivable in the borrowing base certificates, Parties focus on that element of the Borrowing Base in these actions.

¶ 132) Before Plaintiff would make a credit advance to AMC based on the amounts reflected in a particular BBC, one of Plaintiff's agents from EAI would review the BBC, along with materials AMC submitted to Plaintiff as backup documents. Timothy Rogers ("Rogers"), vice president of EAI, was responsible for the day-to-day administration of the BBCs submitted by AMC, which included reviewing the BBCs and their backup documents, (*id.* ¶¶ 135–36, 139) including hundreds of pages of "detailed accounts receivable reports, detailed accounts payable reports, [and] detailed inventory reports." (Rogers Dep. 316:9–11, at Miller Decl., Ex. K) Rogers reported to David Alexander ("Alexander"), senior vice president and officer of the company, whom Rogers would inform should any issues arise with the BBCs. (Defs.' 56.1 Stmt. ¶¶ 135–36) According to Rogers, both he and Alexander reviewed the BBCs submitted by AMC as well as their backup documentation. (Rogers Dep. 316:18–20, at Miller Decl., Ex. K) Debra Ross ("Ross"), CFA, assisted Rogers in processing AMC's applications for advances under the Credit Agreement. (Defs.' 56.1 Stmt. ¶ 137)

Over the course of the lending-borrowing relationship between Eugenia and AMC under the Credit Agreement, from January 30, 2003 to May 5, 2005, when Plaintiff declared AMC in default, AMC submitted at least 225 BBCs to EAI for credit advances, or approximately two certificates per week. (*Id.* ¶ 134) As Rogers was aware, and as Parties do not dispute, for a given account receivable to be eligible for inclusion in the borrowing base, the Credit Agreement required that the goods in question had to have been shipped to AMC's customer; that the customer had to sign a purchase order and deliver it to AMC; and that the parties had to exchange the requisite contract documents and other paperwork for the transaction. (*Id.* ¶ 146) Yet, from the beginning and over the lifetime of the Credit Agreement, AMC included in the BBCs it submitted to EAI accounts receivable that were ineligible under the express terms of the Agreement, and explicitly marked the deficiencies of such accounts in the backup materials it submitted after the BBCs. Plaintiff and Defendants do not dispute that the backup documents for the BBCs expressly disclosed that the borrowing base calculated by AMC included:

- 548 transactions in which only a name or date was referenced, without any reference to a purchase order having been issued;

- 529 transactions expressly identified as "NOPOs" (sales for which no purchase order existed);

- 104 transactions for which AMC had obtained only verbal, quoted, intended, or other non-binding commitments to purchase;

- 23 transactions identified as pending or pre-billed; and

- 100 transactions that referenced a service contract instead of a purchase order.

(*Id.* ¶ 153) These transactions represent about 5.6% of approximately 24,830 total transactions included in the BBCs AMC submitted to Plaintiff over the course of the Agreement. (Pl.'s 56.1 Stmt. ¶ 153)

Until declaring AMC in default of the Agreement, Plaintiff did not reject any of the BBCs AMC submitted to Plaintiff vis-à-vis EAI. (Defs.' 56.1 Stmt. ¶ 157) As of January 24, 2006, Eugenia had advanced funds to AMC totaling $136,429,501. (*Id.* ¶ 158) By March 31, 2006, AMC had remitted $139,724,968 into the lockbox in repayment to Plaintiff. (*Id.*)

However Plaintiff, its officers, employees, and agents were authorized under the

Agreement to audit the collateral that secured the Credit Agreement at AMC's expense, Plaintiff never performed a single audit. (*Id.* ¶¶ 159–160) To the extent that Plaintiff claims that the crisis management firm Morris Anderson was engaged at its behest to investigate AMC's operations, (Pl.'s 56.1 Stmt. ¶ 125), that firm's principal, Baker Smith, testified that it was *AMC,* not Eugenia, that retained the firm, and that AMC did not retain Morris Anderson on behalf of Eugenia. (*See* Smith Dep. 11:17–12:2, at Karlan Decl., Ex. GG) Smith further testified that the "purpose of the engagement was to validate AMC's business plan including their . . . projected operating results," and that an audit or field examination of the collateral underlying the Credit Agreement with Eugenia was "outside [the] scope and outside of activities performed." (*See id.* at 16:7–17:14)

In May 2005, Plaintiff declared AMC to be in default of the Credit Agreement and terminated all funding to AMC, allegedly based on information provided by Glaser that AMC had engaged in financial irregularities in violation of the Credit Agreement. (*Id.* ¶¶ 197–98) AMC had no other lenders at the time; under the terms of the Credit Agreement, AMC was barred from obtaining financing from other lenders and sources. (*Id.* ¶ 196) With the Credit Agreement with Eugenia terminated, AMC made an assignment for the benefit of its creditors as of May 23, 2005, which was filed in the New York County Clerk's office on May 23, 2005. (*Id.* ¶ 199) AMC then ceased operations. (*Id.* ¶ 200) Plaintiff brought suit [05 CV 5397] against AMC for breach of contract on June 7, 2005. Between June 13, 2005 and July 11, 2006, Plaintiff filed the six suits presently before the Court on Motion for Summary Judgment, alleging fraud and derivative breach of fiduciary duty against the individual Defendants alleged to have been directors, "de facto" director, and shareholder of AMC. Defendants filed the instant Joint Motion for Summary Judgment on October 2, 2006.

## II. DISCUSSION

### A. Legal Standard for Summary Judgment

A district court should grant summary judgment when there is "no genuine issue as to any material fact," and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.,* 219 F.3d 104, 107 (2d Cir.2000). Genuine issues of material fact cannot be created by mere conclusory allegations; summary judgment is appropriate only when, "after drawing all reasonable inferences in favor of a non-movant, no reasonable trier of fact could find in favor of that party." *Heublein v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993) (citing *Matsushita Elec. Industr. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

In assessing when summary judgment should be granted, "there must be more than a 'scintilla of evidence' in the nonmovant's favor; there must be evidence upon which a fact-finder could reasonably find for the non-movant." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). While a court must always "resolv[e] ambiguities and draw [ ] reasonable inferences against the moving party," *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986) (citing *Anderson* ), the non-movant may not rely upon "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Id.* at 12. Instead, when the moving party has documented particular facts in the record, "the oppos-

ing party must 'set forth specific facts showing that there is a genuine issue for trial.'" *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir.1986) (quoting Fed.R.Civ.P. 56(e)). Establishing such facts requires going beyond the allegations of the pleadings, as the moment has arrived "'to put up or shut up.'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir.2000) (citation omitted). Unsupported allegations in the pleadings thus cannot create a material issue of fact. *Id.*

## B. *Fraud Claims*

Defendants contend that they are entitled to judgment as a matter of law on all of Plaintiff's fraud claims because no reasonable trier of fact could find that Plaintiff's reliance upon Defendants' superficial representations was reasonable, given the wealth of information Plaintiff possessed, or could very easily have acquired, both before and over the course of the Credit Agreement. Defendants argue that summary judgment on Plaintiff's fraud claims is also appropriate because Plaintiff cannot prove that it was damaged by any purported reliance on Defendants' representations. Plaintiff maintains that its reliance on Defendants' assertions before and during the Agreement was reasonable because no red flags existed to trigger any doubt as to the reliability of Defendants' assertions, or need for further inquiry. Plaintiff contends that AMC owes Plaintiff millions of dollars in unpaid loan principal due under the Agreement, and asserts that this loss constitutes proper damages to sustain a claim of fraud.

■ "Under New York law, the five elements of a fraud claim must be shown by clear and convincing evidence: (1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the

plaintiff; and (5) resulting damage to the plaintiff." *Crigger v. Fahnestock & Co., Inc.*, 443 F.3d 230, 234 (2d Cir.2006) (citation omitted); *see Lama Holding Co. v. Smith Barney*, 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (N.Y.1996). Defendants' motion calls for summary judgment on Plaintiff's fraud claims based on Plaintiff's inability to sustain the fourth and fifth elements of this standard—that is, that Plaintiff's reliance was reasonable, and that Plaintiff was damaged. Defendants do not question, and it is clear on the factual record from Parties' discovery, that Defendants made representations on the face of the borrowing base certificates they submitted to Plaintiff that tiptoed around the literal terms of the Credit Agreement. (*See, e.g.*, Defs.' 56.1 Stmt. ¶ 148 ("During the entire life of the Credit Agreement, the BBCs that AMC provided to plaintiff often included documents showing that it was including accounts receivable in the borrowing base that did not meet the Credit Agreement's literal definitions of an Eligible Account.")) However, misleading representations alone are grossly insufficient to sustain a claim of fraud under New York law; Plaintiff must prove that its reliance upon Defendants' statements or omissions was reasonable, given its possession of and access to information, and that it suffered real, out-of-pocket damages as a result of its reliance.

### (1) *Plaintiff's Reliance*

■ Defendants argue that the wealth of knowledge Plaintiff possessed regarding AMC's finances before entering into the Credit Agreement, including the restrictions GECC had placed on its own loans to AMC, and its subsequent withdrawal of support, flatly precludes Plaintiff from asserting any claim that Defendants fraudulently induced Plaintiff into the Agreement. With regard to Plaintiff's claims of

fraud and aiding and abetting fraud during the term of the Agreement, Defendants point the Court to the undisputed fact that AMC, and Defendants as AMC's agents, placed into Plaintiff's very hands detailed evidence explaining how they had calculated the totals represented on the face of the BBCs, and explicitly marking ineligible accounts when and where they were included. Because Plaintiff not only had access to, but direct possession of, the truth, Defendants assert that Plaintiff cannot possibly expect the Court, or any reasonable juror, to find under New York law that Plaintiff relied reasonably and to its detriment on Defendants' representations. Looking to New York law as interpreted within this Circuit, the Court agrees.

Proof of "reasonable" or "justifiable" reliance is necessary to sustain a fraud claim "in order to demonstrate causation. Where a plaintiff actually knew at the time a representation was made that it was false, she cannot claim to have relied on the truth of that representation, and any injury she suffers is therefore not attributable to the defendant." *JP Morgan Chase Bank v. Winnick,* 350 F.Supp.2d 393, 405 (S.D.N.Y.2004) (citing *Banque Franco–Hellenique de Commerce Int'l et Maritime v. Christophides,* 106 F.3d 22, 27 (2d Cir.1997)). The question of whether a plaintiff's reliance was reasonable typically turns on plaintiff's knowledge, or access to knowledge, at the time the alleged misrepresentations were made; that is, what plaintiff knew, or should have ascertained, given the particular circumstances. As Judge Friendly explained in *Mallis v. Bankers Trust Co.,* 615 F.2d 68, 80 (2d Cir.1980) (*abrogated in part on other grounds by Peltz v. SHB Commodities,* 115 F.3d 1082, 1090 (2d Cir.1997)), when misrepresentations relate to matters found to be "peculiarly within" a defendant's knowledge, "it is said that plaintiff

may rely without prosecuting an investigation, as he has no independent means of ascertaining the truth." However, when plaintiff "has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means." *Id.* at 80–81. While "the law does not require that a defrauded party go to the ends of the earth to discover the falsity of a statement, patent foolishness is not excused." *Banque Franco–Hellenique,* 106 F.3d at 27.

This is doubly so when the plaintiff is not naive and inexperienced, but is an extremely complex and sophisticated amalgam of business entities. It is well-established that "[w]here sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access. New York courts are particularly disinclined to entertain claims of justifiable reliance." *Schlaifer Nance & Co. v. Estate of Andy Warhol,* 119 F.3d 91, 98 (2d Cir.1997) (citing *Grumman Allied Indus. v. Rohr Indus., Inc.,* 748 F.2d 729, 737 (2d Cir.1984)).

A heightened degree of diligence is also required where circumstances were such that plaintiff had hints of falsity. *See Keywell Corp. v. Weinstein,* 33 F.3d 159, 164 (2d Cir.1994) ("When a party is aware of circumstances that indicate certain representations may be false, that party cannot reasonably rely on those representations, but must make additional inquiry to determine their accuracy."); *Mallis,* 615 F.2d at 81 ("Decisions holding that reliance on misrepresentations was not justified are generally cases in which plaintiff was placed on guard or practically faced with the facts."). A plaintiff "cannot close his eyes to an obvious fraud, and cannot demonstrate reasonable reliance without making inquiry and investigation if he has the ability, through ordinary intelligence, to

ferret out the reliability or truth about an investment." *Crigger,* 443 F.3d at 234.

The question of whether a party's reliance was reasonable is "always nettlesome because it is so fact-intensive," *Schlaifer,* 119 F.3d at 98–99, and "ordinarily a question of fact to be determined at trial," *Computech Intern., Inc. v. Compaq Computer Corp.,* 2004 WL 1126320, at *9 (S.D.N.Y. May 21, 2004) (citation omitted). Where "the reasonableness of reliance depends upon factual determinations that are not plain from a review of the complaint and its attachments or that remain in dispute after discovery, the fraud claim should not be summarily dismissed on that ground." *Doehla v. Wathne Limited, Inc.,* 1999 WL 566311, at *12 (S.D.N.Y. Aug. 3, 1999). However, the Court is more than satisfied by the voluminous and exhaustive discovery in this case, which has established the sophistication of Plaintiff and its possession of and access to an abundance of knowledge, both before it entered into the Credit Agreement and during the time the Credit Agreement was in force, that no question of fact remains that could protect Plaintiff's claim of reasonable reliance from summary judgment. Plaintiff—one of a series of related entities linked among a complex investment network owned by a sophisticated and well-insulated businessman and run and advised by a team of trained businessmen and lawyers—was no hayseed as it approached and executed the Credit Agreement with AMC. As the facts leading up to the 2001 and 2003 agreements demonstrate, Eugenia's investment in the ailing company was a considered, deliberate, and strategic maneuver, one of a number of investments made at the time by Hans–Werner Hector's elaborate investment empire. (*See* Defs.' 56.1 Stmt. ¶¶ 9–10, 45–51, 68, 71–75) Plaintiff, itself a smooth and sophisticated operator, was further assisted in closing the loan Agreement with AMC by a team of trained advisors with particular expertise in crafting and coordinating such agreements. (*See id.* ¶¶ 65, 84–86, 89–90, 92) Plaintiff possessed, and otherwise had easy access to, a wealth of information about AMC's financial health at all relevant times in this case. It is plain from Parties' undisputed facts that Eugenia and its representatives knew before executing the Credit Agreement that Plaintiff was investing in a company, AMC, which was, and had long been, treading choppy financial waters. (*See, e.g., id.* ¶¶ 73–75) Plaintiff knew that AMC's principal creditor, GECC, was discontinuing its line of credit with AMC, and Plaintiff made its investment, as least in part, with the express purpose of helping AMC get back on its feet. (*See id.* ¶¶ 67–68) If Plaintiff wanted more information before entering into the Agreement—in particular, if it wanted further details about why GECC had decided to withdraw its support—all evidence points to Plaintiff's easy and unfettered access to additional information. (*See id.* at ¶¶ 78 (citing the Credit Agreement, § 2.1(g), at Miller Decl., Ex. F) ("As a condition precedent to the Credit Agreement, Eugenia had the right to 'complete[ ] its business and legal due diligence, including a roll forward of its previous collateral audit, with results satisfactory to Lender.' ") & 79 (citing the Credit Agreement, § 11.3, at Miller Decl., Ex. F) ("AMC was required to bear plaintiff's due diligence expenses 'incurred in connection with the negotiation and preparation of the Loan Documents and for advice, assistance, or other representation incurred in connection with' " the transaction.)) Plaintiff specifically arranged for its loan to replace GECC's credit facility. Indeed, the rates and terms imposed on AMC by Plaintiff establish that Plaintiff knew exactly what it was getting into. (Defs.' 56.1 Stmt. ¶¶ 113–117) While Plaintiff baldly claims that Defendant Glaser

"made numerous fraudulent misrepresentations regarding GECC," (Pl.'s 56.1 Stmt. ¶ 67) it produces no evidence to support that accusation. As Plaintiff is aware, unsupported allegations will not insulate Plaintiff from summary judgment. On the facts presented, there is no question that Plaintiff, a sophisticated investment entity, had such access to relevant information to preclude a claim to reasonable reliance and fraudulent inducement, and Plaintiff has proffered no evidence to the Court that it was barred that access by Defendants. Plaintiff's claim to fraudulent inducement into the Credit Agreement fails as a matter of law.

Turning to Plaintiff's claims that Defendants committed, aided and abetted fraud over the course of the Credit Agreement, the Court notes that Eugenia not only had *access* to, but actual *possession* of, the truth behind Defendants' representations. Defendants argue, and Plaintiff does not dispute, that AMC and Defendants as its agents repeatedly placed evidence explaining their representations right into Eugenia's hands. Plaintiff does not contest that Defendants expressly labeled the ineligible accounts AMC included in the BBCs in the backup materials it submitted to Plaintiff. (Defs.' 56.1 Stmt. ¶¶ 153–54) Plaintiff argues instead that the small percentage of transactions implicated (according to Plaintiff, approximately 5.62% of the total transactions) (Pl.'s 56.1 Stmt. ¶ 153) was swallowed up and obscured within "voluminous" backup documents submitted separately and after the BBCs (*see, e.g., id.* ¶¶ 147–48, 151, 153), and finding the ineligible account transactions would have been akin to locating a needle in a haystack. Given what Plaintiff knew at the time, Plaintiff maintains that rooting around for

such a needle was unwarranted. Nevertheless, they were there, and Plaintiff had the wherewithal to see what was before its very eyes.

However small the number of ineligible transactions, the Court cannot, under New York law, look past the additional and surrounding material facts that, together with these transactions, point clearly to Plaintiff's access to knowledge, and duty to pay attention and make inquiry before relying on Defendants' statements. Sophisticated Eugenia had a team of qualified advisors that it paid explicitly to review the BBCs and backup materials before Plaintiff advanced any funds to AMC in accordance with those submissions. The truth was in Plaintiff's very hands for more than two years. To the extent that Plaintiff contends that its level of review was appropriate, given the absence of red flags [11] to raise cause for further scrutiny, the Court finds that AMC's financial distress and weak credit history were fully known to Plaintiff, and the rates of interest and terms extracted from AMC by Plaintiff in the Credit Agreement establish Plaintiff's knowledge.

Despite the clear requirement in this Circuit that a Plaintiff—particularly a sophisticated one—avail itself of its access to information before crying fraud, there is *no* evidence that Plaintiff took advantage of and asserted any one of its rights and opportunities under the Credit Agreement to scrutinize AMC's collateral and books. (*Id.* ¶ 160) While AMC was required to bear the costs of up to two audits per year of the collateral that secured the Credit Agreement at Plaintiff's request, Plaintiff never availed itself of a single audit. (*Id.* ¶ 159) While Plaintiff claims to have engaged the crisis management firm Morris

---

**11.** At least 57 of 225 BBCs submitted by AMC to Plaintiff were unsigned (Defs.' 56.1 Stmt. ¶ 152) which should have raised at least one of Plaintiff's eyebrows upon even a cursory review.

Anderson to investigate AMC's operations, that firm's principal, Baker Smith, testified that it was *AMC*, not Eugenia, that retained the firm, and that AMC did not retain Morris Anderson on behalf of Eugenia. (*See* Smith Dep. 11:17–12:2, at Karlan Decl., Ex. GG) [12]

The factual record leaves open no question that Plaintiff had in its possession an abundance of information and unobstructed access to much more, and knew enough about AMC's precarious finances to warrant at least minimal scrutiny before relying blindly on the totals Defendants represented on the face of the borrowing base certificates. Plaintiff's reliance was unreasonable, and Plaintiff's claims to fraud under the Credit Agreement fail as a matter of law.

### (2) Damages

■ Even were the Court to find an open question of material fact to insulate Plaintiff from summary judgment on the issue of reliance, Plaintiff's fraud claims would otherwise fail on the facts because Plaintiff cannot prove that it was damaged. Under New York law on fraud, which requires out-of-pocket losses, Plaintiff has demonstrated no actionable damages.

■■ It is well-settled that to prove injury from fraud under New York law, a party must show actual pecuniary loss. *Rosen v. Spanierman*, 894 F.2d 28, 34 (2d Cir.1990); *see also Urtz v. New York Cent. & Hudson Riv. R.R. Co.*, 202 N.Y. 170, 173, 95 N.E. 711 (N.Y.1911) ("Fraud and deceit alone do not warrant the recovery of damages. Deceit and injury must concur."). In New York, damages for claims of fraud and fraudulent inducement are subject to the "out-of-pocket rule," which confines plaintiffs to recovering actual losses sustained as the direct result of the wrong alleged, and excludes expected profits. *Lama Holding Co. v. Smith Barney*, 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (N.Y.1996), citing *Reno v. Bull*, 226 N.Y. 546, 553, 124 N.E. 144 (N.Y.1919) ("Damages are to be calculated to compensate plaintiffs for what they lost because of the fraud, not to compensate them for what they might have gained. Under the out-of-pocket rule, there can be no recovery of profits which would have been realized in the absence of fraud.").

Defendants have effectively demonstrated that Plaintiff suffered no out-of-pocket loss as the result of Defendants' actions under the Credit Agreement with AMC. In fact, Plaintiff walked away from the bargain with $3.3 million *more* in its pockets than it had before entering the Agreement. In support of their Motion for Summary Judgment, Defendants refer the Court to the testimony of Plaintiff's own expert, Stephen C. Bell, CPA, who testified as follows:

Q: Under the amount borrowed, you see that Eugenia paid out $136,429,501 over the life of the revolving credit agreement, correct?

Bell: Yes.

Q: And the next number, the total under the payment/transfer into lock box that Eugenia actually received in the form of cash $139,724,968 over the life of the revolving credit agreement, is that correct?

Bell: That's correct

. . .

Q: So from January 30, 2003 to March 31, 2006 isn't it true that Eugenia actual-

---

**12.** Smith further testified that the "purpose of the engagement was to validate AMC's business plan including their ... projected operating results," and that an audit or field examination of the collateral underlying the Credit Agreement with Eugenia was "outside [the] scope and outside of activities performed." (*See id.* at 16:7–17:14)

ly received approximately $3.3 million more back in its pocket than it had paid out of pocket to AMC Computer under the revolving credit agreement?

Bell: Under the revolving credit agreement?

Q: Yes.

Bell: You're excluding interest?

Q: I'm simply asking about the cash—

Bell:—in and cash out.

Q:—that Eugenia paid out and the cash Eugenia received back. That Eugenia received back approximately $3.3 million more in cash than it paid out over the life of the revolving credit agreement.

Bell: I mean, as far as cash in and cash out, I think that's a correct statement. Other than the pass-through fees from Northern Trust.[13]

(Bell Dep. 167:14–168:25, at Karlan Decl., Ex. II)

Plaintiff does not dispute the conclusion that Defendants draw from the testimony of its expert in terms of the actual dollars that it loaned out to AMC and the amount that it accepted in repayment under the Revolver Loan. (*See* Pl.'s 56.1 Stmt. ¶ 158 ("The assertion[ ] by defendants represents only cash in and cash out, and does not include consideration of interest, fees, and expenses that are set forth in the Credit Agreement.")) Instead, Plaintiff maintains that because interest under a revolving loan constantly accrues and be-

comes part of the loan principal, Plaintiff is claiming principal, not interest, and principal is a proper measure of damages in fraud.

The Court disagrees. Whether principal, interest, or some combination of the two, these are not out-of-pocket losses required to sustain a claim of fraud under New York law. Under the out-of-pocket rule, recovery of consequential damages naturally flowing from a fraud is limited to the sum necessary to restore a party to the position it occupied before commission of the fraud. *See, e.g., Kaleidoscope Media Group, Inc. v. Entertainment Solutions, Inc.,* 2001 WL 849532 (S.D.N.Y. July 19, 2001) However Plaintiff may have lost the benefit of its bargain with AMC as a result of Defendants' actions, these alleged losses are properly sought in a breach of contract action, not an action for fraud.[14] *See Great Earth Intern. Franchising Corp. v. Milks Development,* 311 F.Supp.2d 419 (S.D.N.Y.2004) (in order to sustain a claim of fraud, plaintiffs must "make an offer of proof demonstrating that the costs they seek to recover are unrecoverable as contract damages"); *Osan Ltd. v. Accenture LLP,* 454 F.Supp.2d 46, 56 (E.D.N.Y.2006) ("Plaintiff's demand [for compensatory damages] would either be entirely, or almost entirely, unrecoverable under its fraud cause of action because the same damages could be claimed under a breach of contract theory").

---

**13.** Bell later testified that the pass-through fees to Northern Trust totaled $88,503. (Bell Dep., T169:1-11) The fees are thus insignificant to the relevant point at issue: that Eugenia received $3.3 million more from AMC than it paid to it.

**14.** That Eugenia won a judgment against AMC Investors, LLC and AMC Investors II, LLC in the breach of contract action it filed in state court (*see* footnote 1, *supra*) for lost principal under the Agreement does nothing to alter the fact that Plaintiff suffered no out-

of-pocket losses attributable to Defendants here. Rather, the state court's decision only strengthens this Court's conclusion that Plaintiff's are *contract* damages inappropriately sought here in tort. The Court further notes that Plaintiff was compensated in that action to the tune of $10,710,455.00. What additional damages Plaintiff expects here are beyond the Court's imagination, and certainly beyond the Court's ability to award, given the pertinent New York law on fraud.

Because Plaintiff can prove neither that its reliance on Defendants' representations was reasonable, nor that it was damaged be Defendants' alleged fraud, Defendants' Motion for Summary Judgment on Plaintiff's fraud claims is GRANTED.

### C. Derivative Breach of Fiduciary Duty Claims

To recover alleged damages suffered by AMC as a corporation as a result of Defendants' actions under the Credit Agreement, Plaintiff asserts derivative claims of breach of fiduciary duty and aiding and abetting breach of fiduciary duty on behalf of AMC against Defendants Surinder, Narinder and Parvinder Chabra, Reale, Glaser, Augustin, Dell and Glosson. Specifically, Plaintiff alleges that Defendants, as members of the Board of Directors, "de facto" director, and majority shareholder of AMC, violated their fiduciary duties of good faith, due care, and loyalty to AMC by causing the company to default on its Agreement with Plaintiff, incur debt far beyond its ability to repay, and grant security interests beyond the value of its assets. Further, Plaintiff claims that Defendants also violated their duties of honesty, candor and complete disclosure to AMC by causing or allowing AMC's communications with its lenders to be materially misleading and incomplete. (Amended Consolidated Complaint ¶ 119) As a direct and proximate result of Defendants' acts and omissions, Plaintiff alleges, AMC was injured and damaged in that its debt was wrongfully expanded out of proportion with its ability to repay, it became deeply insolvent, it was forced to cease operations and incur legal and administrative costs, its relationships were undermined, and its assets were dissipated. (*Id.* ¶ 124) Defendants move for summary judgment on these claims on two grounds: that Plaintiff lacks standing to bring derivative claims on behalf of AMC, and that Plaintiff can-

not prove that AMC was actually damaged as a result of the alleged breaches. AMC was insolvent at the inception of the Credit Agreement, Defendants assert, and Defendants' actions to draw funds for the company from its Agreement with Plaintiff were done in good faith to sustain the company's life; Plaintiff has not, Defendants contend, demonstrated any improper purpose to their efforts. Defendants Glaser and Parvinder Chabra, who were never nominal officers or directors of AMC, contend that they did not owe any fiduciary duties to AMC, and that Plaintiff's derivative claims against them should be dismissed.

■ As a preliminary matter, the Court dispenses with Defendants' assertion that Plaintiff lacks standing to bring this suit. In their Joint Motion for Summary Judgment, Defendants claim that Plaintiff lacks standing to bring derivative claims on behalf of AMC because AMC transferred any such claims it could assert to an assignee. Plaintiff counters that under state law, an assignee's powers are not exclusive; as such, the mere existence of an assignee does not defy Plaintiff's standing. Moreover, Plaintiff points out that a designated assignee no longer exists here; the court-appointed assignee in this matter resigned and has not been replaced. Defendants have not contested Plaintiff's arguments, and do not reassert their standing argument, in their reply to Plaintiff. The Court agrees with Plaintiff that the once-appointment of an assignee does not nullify Plaintiff's otherwise proper standing as a shareholder of AMC to assert a derivative action on its behalf. As Plaintiff has pointed out, Eugenia has standing to bring a derivative action based on its status as a shareholder of AMC. *See, e.g., Ross v. Bernhard,* 396 U.S. 531, 538, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970) ("[T]he derivative suit has dual aspects: first, the stockhold-

er's right to sue on behalf of the corporation ... second, the claim of the corporation against directors or third parties ....").  Under the Credit Agreement, Eugenia received 3.2 million shares of Series D preferred stock at $.001 per share, preferred stock that carried voting rights under AMC's amended Certificate of Incorporation.  (Defs.' 56.1 Stmt. ¶ 123; AMC Computer Corp., Cert. of Amendment to Cert. of Incorporation, at 1) That Plaintiff was a preferred stockholder does not alter its standing to bring this suit; a preferred stockholder with voting rights may maintain a derivative action.  *Klebanow v. New York Produce Exchange*, 344 F.2d 294, 297 (2d Cir.1965) (citing *Ashwander v. TVA*, 297 U.S. 288, 321–322, 56 S.Ct. 466, 80 L.Ed. 688 (1936)).

██ "In New York, a claim for breach of fiduciary duty must allege: (1) breach by a fiduciary of a duty owed to the plaintiff; (2) defendant's knowing participation in the breach; and (3) damages." *CreditSights, Inc. v. Ciasullo*, 2008 WL 4185737, 16 (S.D.N.Y. Sept. 5, 2008) (Batts, J.) (citing *SCS Communications, Inc. v. Herrick Co., Inc.*, 360 F.3d 329, 342 (2d Cir.2004)). As members of AMC's Board of Directors at all times relevant to this case, Defendants Sonny Chabra, Narinder Chabra, Ron Augustin, Glen Dell, Burton Glosson, and Robert Reale do not contest that each owed fiduciary duties to AMC. It is well-established that the directors of a corporation owe fiduciary duties to that corporation.  *See, e.g., Patrick v. Allen*, 355 F.Supp.2d 704 (S.D.N.Y.2005); *N.Y. BUS. CORP. L. § 717(a)* (directors must perform their duties "in good faith and with that degree of care which an ordinarily prudent person in a like position would use under similar circumstances.").  Defendants Parvinder Chabra and Robert Glaser, however, argue that Plaintiff's allegations do not reach them, as they were never nominal officers or directors of AMC, and as such, did not owe fiduciary duties to the company.

The Court remains unconvinced after Parties' discovery that Defendants Parvinder Chabra and Glaser owed fiduciary duties to AMC under the standard set by New York law.  While fiduciary duties are not confined to the officers and directors of a corporation, "[u]nder New York law, a fiduciary relationship arises from a party's assumption of control and responsibility for the affairs of another." *TP Group, Inc. v. Wilson*, 1990 WL 52131, at *3 (S.D.N.Y. April 17, 1990); *see Henneberry v. Sumitomo Corp. of America*, 2005 WL 991772 (S.D.N.Y. April 27, 2005) (citing *United States v. Brennan*, 183 F.3d 139, 150 (2d Cir.1999)) ("at the heart of the fiduciary relationship lies reliance, and *de facto control and dominance*") (emphasis in original).  Possession of stock, by itself, does not establish a fiduciary duty between a shareholder and a corporation.  *Gould v. Ruefenacht*, 471 U.S. 701, 705, 105 S.Ct. 2308, 85 L.Ed.2d 708 (1985) ("Control [ ] may not be determined simply by ascertaining what percentage of the company's stock has been purchased.... [E]ven the ownership of more than 50% may not result in effective control.").  Rather, "actual control may also depend on such variables as voting rights, veto rights, or requirements for a super-majority vote on issues pertinent to company management." *Id.* (citing *Golden v. Garafalo*, 678 F.2d 1139, 1146 (2d Cir.1982)).  "Whether control has passed with the stock may also depend on how involved in management the purchaser intends to be." *Id.* (citing *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 695–96, 105 S.Ct. 2312, 85 L.Ed.2d 692 (1985)).

██ Given the facts presented, it is clear to this Court that Parvinder Chabra owed no fiduciary duties to AMC. At no relevant time does Plaintiff claim, or offer

any evidence, that Defendant Parvinder Chabra exercised *any* control at AMC. Nor does Plaintiff argue with Defendants' statement that Parvinder Chabra "did not commit or participate in any of the alleged acts or omissions that form the basis for plaintiff's claims of fraud and breach of fiduciary duty." (Defs.' 56.1 Stmt. ¶ 44) Plaintiff asserts only that Parvinder Chabra "is a member of a group of persons whose ownership constitutes a majority of AMC's shares." (*Id.*) Under New York law, this is insufficient to establish a fiduciary duty between Mrs. Chabra and AMC.

While Plaintiff's derivative claim of breach of fiduciary duty against Defendant Glaser might require a more fact-intensive inquiry, given the facts Plaintiff has introduced into the record regarding Glaser's voting rights and involvement in the AMC Board of Directors, (*see* Pl.'s 56.1 Stmt. ¶ 43) the Court need not reach that inquiry as it finds that Plaintiff's derivative claims of breach of fiduciary duty against all Defendants fail as a matter of law because Plaintiff cannot prove that Defendants caused actual harm to AMC, as required to sustain these claims under New York law.

A plaintiff in a derivative action must show that the corporation in question has suffered a cognizable injury and has failed to enforce a right in its own behalf. *See, e.g., In Re Trump Hotels Shareholder Derivative Litig.*, 2000 WL 1371317, at *5 (S.D.N.Y. Sept. 20, 2000) (Batts, J.) (citing *Ross*, 396 U.S. at 538, 90 S.Ct. 733) ("Unlike a claim brought by a plaintiff on his own behalf to enforce a right he personally possesses, a derivative claim is brought on behalf of a corporation to remedy an injury suffered by the corporation."). Plaintiff argues that Defendants harmed AMC by causing the company to violate its loan agreement with Plaintiff, artificially inflate its accounts receivable, and borrow money after it was already deeply in debt, exacerbating the company's insolvency and triggering its demise and liquidation in 2005. Defendants counter that AMC was insolvent from the beginning of its Agreement with Plaintiff, and argue that Plaintiff has failed to show that Defendants' efforts to sustain AMC by drawing upon its loan agreement with Plaintiff were done for personal gain, or any other improper purpose. Rather, Defendants assert, Plaintiff's derivative claims are no more than a vain attempt to re-cast its own alleged bruises as injuries to AMC under another legal theory.

New York courts have recognized "deepening insolvency" as a theory of damages that may result from the commission of a separate tort, including breach of fiduciary duty. *See In re Parmalat*, 383 F.Supp.2d 587, 601–02 (S.D.N.Y.2005) (citing *In re Global Serv. Group LLC*, 316 B.R. 451, 457–59 (Bankr.S.D.N.Y.2004)) ("If officers and directors can be shown to have breached their fiduciary duties by deepening a corporation's insolvency, and the resulting injury to the corporation is cognizable ... that injury is compensable on a claim for breach of fiduciary duty."); *In re Adelphia Communication Corp.*, 2006 WL 687153, at *16 (Bkrtcy.S.D.N.Y. March 6, 2006) ("Deepening insolvency refers to the fraudulent prolongation of a corporation's life beyond insolvency, resulting in damage to the corporation caused by the increased debt."). Showing that a party has increased a company's insolvency does not, however, by itself demonstrate that the company has been damaged. "Prolonging an insolvent corporation's life, without more, will not result in liability" under either a tort or damage theory. *In re Global Service Group, LLC*, 316 B.R. at 458. Instead, "one seeking to recover for 'deepening insolvency' must

show that the defendant prolonged the company's life in breach of a separate duty, or committed an actionable tort that contributed to the continued operation of a corporation and its increased debt." *Id.*

The fiduciaries of an insolvent business "owe duties to multiple constituencies whose interests may diverge," including the business, its shareholders, and creditors, and "may well conclude that the company should continue to operate in order to maximize its long-term wealth creating capacity, or more generally, its enterprise value." *Id.* at 460 ("In fact, chapter 11 is based on the accepted notion that a business is worth more to everyone alive than dead.") Contrary to the inference Plaintiff seems to draw from Defendants' actions, "there is no absolute duty . . . to shut down and liquidate an insolvent corporation. The fiduciaries may, consistent with the business judgment rule, continue to operate the corporation's business." *Id.* "[A] manager's negligent but good faith decision to operate an insolvent business will not subject him to liability for 'deepening insolvency.' " *Id.* at 461.

To overcome the business judgment rule, rather, a plaintiff must show that the fiduciary acted in bad faith or with fraudulent intent. *Id.*; *see Lippe v. Bairnco Corp.*, 230 B.R. 906, 916–17 (S.D.N.Y. 1999) ("Under New York law, the business judgment rule bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes."). However Plaintiff accuses Defendants of self-dealing, such as using AMC funds to pay themselves and AMC's employees, pay fees to MapleWood and directors, and pay rent to Sonny Chabra vis-à-vis AMC's realtor, Paran Realty, (Pl.'s 56.1 Stmt. ¶ 374) the Court finds no evidence to sug-

gest that any of Defendants' actions were made in bad faith. While Plaintiff alleges that AMC paid sums to Defendant Narinder Chabra or to credit cards issued in his name in violation of the Credit Agreement, (Pl.'s 56.1 Stmt. ¶ 375) for example, additional facts supplied by Defendants show that Narinder Chabra used his credit card to pay corporate debts, and that AMC's payments to Mr. Chabra were proper reimbursements. (*Id.* ¶ 193) Plaintiff's accusation that AMC's rent payments to Paran Realty, owned by Sonny Chabra, constituted improper self-dealing, (Pl.'s 56.1 Stmt. ¶ 376) is specious; as Defendants point out, Sonny Chabra's relationship to Paran Realty was disclosed to Plaintiff prior to executing the Agreement, and these payments were properly made as rent for AMC. (*Id.*) However Plaintiff may have demonstrated that AMC made payments to its employees after AMC ceased operations in May 2005, (*id.*, citing S. Chabra Dep. 191:7–192:19, 193:6–194:8, at Karlan Decl., Ex. G) Plaintiff has adduced no facts to counter Defendants' explanation that these installments represented salary payments that had been previously suspended. (Defs.' 56.1 Stmt. ¶ 191) The facts Plaintiff has introduced may show that Defendants acted in violation of the Credit Agreement with Plaintiff, supporting a breach of contract claim, but they do not demonstrate the bad faith necessary to sustain a derivative claim of breach of fiduciary duty. Plaintiff has failed to muster facts to support its allegations, create a genuine issue for trial, and defeat summary judgment.

Without a surviving derivative breach of fiduciary duty claim, Plaintiff's appended claim that Defendants aided and abetted said breaches of fiduciary duty also fails. As such, Defendants' Motion for Summary Judgment on all of Plaintiff's derivative breach of fiduciary duty claims is GRANT-

ED.[15]

## III. CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is GRANTED as to Plaintiff's fraud, fraudulent inducement, and aiding and abetting fraud claims against all Defendants, and GRANTED as to Plaintiff's derivative breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims against all Defendants. The Clerk of Court is directed to close the dockets in 05 CV 5277, 05 CV 5330, 05 CV 5635, 05 CV 5816, 05 CV 7262, and 06 CV 2997.

SO ORDERED.

---

**15.** Having granted summary judgment on all of Plaintiff's fraud and derivative breach of fiduciary duty claims, the Court finds no need to address the claims asserted in Defendants' untimely Motion to Strike.