# United States Court of Appeals
## For the First Circuit

No. 15-1945

TUTOR PERINI CORPORATION,

Plaintiff, Appellant,

v.

BANC OF AMERICA SECURITIES LLC, n/k/a Merrill Lynch, Pierce,
Fenner & Smith, Incorporated, successor by merger; BANK OF
AMERICA, N.A.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Thompson, Selya, and Kayatta,
Circuit Judges.

George F. Carpinello, with whom Adam R. Shaw, John F. Dew,
and Boies Schiller & Flexner, LLP were on brief, for appellant.
Jonathan Rosenberg, with whom B. Andrew Bednark, Leah
Godesky, and O'Melveny & Myers LLP were on brief, for appellees.

November 21, 2016

**THOMPSON**, <u>Circuit Judge</u>.

**OVERVIEW**

Today's dispute is part of the fallout from the financial system's near meltdown in the late 2000s. On one side of this dispute is Tutor Perini Corporation ("Tutor Perini"). On the other side is Banc of America Securities LLC and Bank of America, N.A. ("BAS" and "BANA," respectively). To hear Tutor Perini tell it, BAS — acting as its broker-dealer, and with BANA's knowledge and acquiescence — sold it auction-rate securities ("ARS") without disclosing that the ARS market was heading for a spectacular crash.[1] But to hear BAS and BANA tell it, BAS actually disclosed the risks that later materialized. An obviously unconvinced Tutor Perini sued BAS and BANA in federal district court, alleging securities fraud under state and federal law, as well as a medley of other state-law claims. On cross-motions for summary judgment, the district judge sided with BAS and BANA. Concluding that triable claims exist worthy of a jury's time and attention, we — for reasons recorded below — affirm in part, vacate in part, and remand.

---

[1] We apologize for all the acronyms — they seem to go with the territory in cases like this, however.

## HOW THE CASE GOT HERE[2]

### (a)
### The Players

Tutor Perini is a giant construction company. And like most corporate colossi, Tutor Perini is extremely cash-conscience: it focuses daily on ensuring that it has enough cash on hand to fund its operations, and it traditionally pours any spare cash into short-term, low-risk, highly-liquid investments (like certificates of deposit and money-market funds) — *i.e.*, investments that will let Tutor Perini get cash back as quickly as possible whenever the need arises.

Which is where BAS came in. A wholly-owned subsidiary of BANA, BAS — now known as Merrill Lynch, Pierce, Fenner & Smith, Incorporated — is a banking company registered as a broker-dealer with the Securities and Exchange Commission. BAS was a moving force behind Tutor Perini's financial approach. And their relationship went back a ways.

Having gotten into financial trouble in the mid-1990s, Tutor Perini found itself in what is called a "workout period," generally defined as a time when the debtor and the creditor try to hammer out an agreement to reduce or discharge a debt. During

---

[2] As required, we take the facts as favorably to Tutor Perini's case as the record permits. See, e.g., Lang v. Wal-Mart Stores East, L.P., 813 F.3d 447, 450 (1st Cir. 2016).

that stretch, BAS served as Tutor Perini's banking advisor under a revolving credit agreement. To help Tutor Perini regain its financial footing, later credit agreements between them put limits on the kinds of cash investments Tutor Perini could make — as a for-instance, Tutor Perini could not invest in ARS.

**(b)**
**An ARS Primer**

Backed by a variety of assets or revenue sources — student loans or municipal assets, for instance — ARS are long-term investments, often with maturity dates of 20 years or more. In the student-loan ARS market, student loans originated under the Federal Family Education Loan Program ("FFELP") were considered high-quality because they were largely guaranteed by the federal government. The credit quality of non-FFELP-backed student-loan ARS and municipal ARS was often enhanced by guarantees — a "wrap" — from "monoline" insurance companies like Ambac Assurance Corporation, which agree to make interest and principal payments if an issuer defaults (*i.e.*, Ambac "wraps" its own credit rating around the debt obligation and guarantees timely interest and principal payments in a default situation).[3]

---

[3] Monoline insurance companies "provide[] guarantees to issuers, often in the form of credit wraps, that enhance the credit of the issuer. These insurance companies first began providing wraps for municipal bond issues, but now provide credit enhancement for other types of bonds, such as mortgage-backed securities and collateralized debt obligations." See *Monoline Insurance Company*,

Parties buy or sell ARS at periodic auctions (held, say, every 7, 28, or 35 days, depending on the particular ARS), with the ARS's interest rate set there too.  These are nonpublic auctions.  Placing bids via authorized broker-dealers, would-be investors say how many ARS they want and what interest rate they will accept (ARS are always bought and sold at par value, so buyers bid by specifying an interest rate rather than a price).  The lowest interest rate needed to sell off all available ARS becomes the "clearing rate."  And the clearing rate becomes the ARS's interest rate until the next auction.  ARS have caps on the highest possible clearing rate, known in the biz as the max rate, which for our purposes is calculated using a byzantine formula based partly on indices like the London Interbank Offered Rate or the Treasury rate (two well-known indices in the financial markets measuring interest rates).  If there are enough buy bids below the max rate so as to allow for the sale of all available ARS, then the auction is deemed a success; but if not, then not — in which case ARS sellers must keep their ARS until the next successful auction, all the while earning interest at the max rate.[4]

---

Investopedia, www.investopedia.com/terms/m/monolineinsurance.asp (last visited Oct. 24, 2016).

[4] An illustration may be helpful:  suppose the market demand required that certain ARS pay 6% interest — if the ARS's max rate was 5%, then the auction would fail because bids above 5% could not be accepted by the auction agent (so there would be no sales).

Like some other broker-dealers, BAS played several roles in the ARS market — structuring and underwriting ARS on behalf of issuers; soliciting and placing ARS orders for investor-customers; and preventing auction failures by committing its own capital to buy ARS for its inventory accounts, from which it sold ARS to its customers. Ultimately, though, the ARS market was not terribly transparent. Among other unknowables, investors usually did not know if an auction only succeeded because of a broker-dealer support bid. They could only learn that from an authorized broker-dealer. Obviously, this lack of transparency made ARS buyers heavily dependent on their broker-dealers for key data to make sound investment decisions.[5]

---

[5] Tutor Perini's expert did a good job of highlighting the ARS market's opaqueness and explaining what that meant to investors:

> The ARS market in 2007-2008 lacked fundamental transparency for investors. Investors simply could not obtain independently much of the material information regarding those investments and markets. They could only know critically important information if their broker(s) told them. That meant that all investors were essentially "broker-dependent" for material information necessary to exercise independent judgment regarding their investments.

"Auction Agents," the expert added, "were generally authorized under the terms of many ARS to release the information concerning the maximum rate, bidding amounts, and other auction data only to the issuer and Authorized Broker-Dealers" — "[d]isclosures to investors were not authorized."

**BAS's ARS Pitch**

In 2004, Tutor Perini opened a nondiscretionary-investment account with BAS — *i.e.*, an account that required BAS to get Tutor Perini's authorization before making account transactions; according to Tutor Perini's treasurer Susan Mellace, BAS would give her investment "options," and she would choose from a BAS-provided "recommended list."  A certified public accountant with a master's degree in finance, Mellace reported to Tutor Perini's chief financial officer, who in turn reported to Tutor Perini's president.  And she discussed what "vehicles" — stocks, bonds, *etc.* — she wanted to invest in with these gentlemen, though "[i]n terms of the day-to-day purchases and sales," those were her calls to make.

Keenly aware of Tutor Perini's investment strategy (*i.e.*, avoiding risks and illiquidity), BAS pitched ARS to Tutor Perini at an in-person meeting in May 2006 — even though (as we noted) its own credit agreement with Tutor Perini banned the company from investing in ARS.  During the confab, BAS salesperson Lois McGrath gave Mellace a PowerPoint presentation on ARS.  Mellace knew nothing about ARS — she "had never" even "heard of" ARS before "that presentation," she later explained.  And up to that point, Tutor Perini had never invested in them.

One of McGrath's PowerPoint slides explained how BAS offered "the full spectrum of fixed income securities underwritten by [BAS], traditional money market funds, and customized portfolios" — "[a]ll of which can be tailored to meet your specific investment guidelines" — and promised BAS's "[s]trict focus on thoroughly identifying your portfolio objectives and understanding your ongoing investment needs, rather than on executing transactions," by providing "[i]nvestment solutions that meet your needs by clearly defining the risk/reward of particular securities and maintaining the highest level of client servicing."  Another slide stressed how BAS pledged that it would "work with [Tutor Perini] to evaluate market conditions and determine which investment" would "meet [Tutor Perini's] investment objectives." Still another slide noted that ARS belonged in a portfolio as part of Tutor Perini's "[c]ore cash" strategy, along with other short-term investments like "U.S. Treasury Bills."  Yet another slide played up ARS's "[l]iquidity opportunities," stressing that "[l]iquidity is enhanced by frequent auctions" and declaring that "the ARS auction process has developed into an established and mature market."  Touting ARS's low risk and high liquidity, another slide emphasized what "a valuable investment tool" "28-day ARS" are for "[c]orporate cash managers" who "typically forecast their cash needs on a monthly basis."  The presentation, though, warned

of "[p]otential risks," stating among other things that ARS auctions could "fail[]" — with "[s]uch instances" typically caused by the "deterioration of issuer credit quality." If an auction failed, the slide added, ARS sellers would be unable to "sell their securities." Mellace understood that auctions "could" — to quote her deposition — "fail," which could "potentially" leave Tutor Perini "holding the security."

Tutor Perini did not buy ARS in May 2006. A few months later, in December 2006, McGrath again recommended that Tutor Perini buy ARS at auction or from BAS's inventory. But after reviewing the credit agreement between Tutor Perini and BAS — which, to repeat, barred Tutor Perini from investing in ARS — McGrath told Mellace to stick with money-market funds. Ever persistent, BAS, through McGrath, amended the credit agreement in January 2007 to allow for ARS as short-term investments.

### (d)
### BAS's "Contagion" Fears

Late in the summer of 2007, the ARS market — which BAS had called a safe investment for Tutor Perini's "core cash" — took quite a hit, with at least 60 auctions failing (presumably because of a global-credit crunch). Although these ARS chiefly involved subprime-mortgage lenders and their insurers, BAS knew immediately that such failures could spread to the entire ARS market. Indeed, BAS's head ARS trader sort of likened the situation to a contagion

- 9 -

that could infect the rest of the ARS market. Actually, BAS's public finance executive did call it a "contagion," saying BAS had to "keep an eye on [it]."

To stop the contagion from advancing, a BAS senior manager stressed three things to BAS personnel during an August 2007 risk-management call: one, "[r]educe balance sheet"; two, "[d]on't be a hero, rein in traders, capture customer flow"; and three, "[w]e come first" — "this is a tough environment and we need to make decisions based on our own interests." Others spoke up about the issue too, including a BAS trader who told her supervisor that BAS's ARS portfolio faced the same risk of auction failure that had hit the subprime-mortgage market. And she warned that BAS had to support an upcoming auction in which Lehman Brothers was the lead broker-dealer, or else the auction would fail and investors would panic (at that time Lehman Brothers was still a major investment bank). Still in contagion-fighting mode, and thinking that increased sales could do the trick, BAS held an in-house "Teach-in" — at the end of August 2007 — to give its financial advisors "a more comprehensive understanding of Student Loan ARS." And BAS stepped up its support bidding at auctions too.

## (e)
## A "Good Time" to Buy ARS

It was then — in September 2007 — that BAS's McGrath emailed Tutor Perini's Mellace to see if Mellace could buy ARS, saying it was "a good time" to dive into that market. Mellace said that she could do some buying and asked McGrath if ARS were "any better" than Tutor Perini's other investments. "Yes they are," McGrath wrote back. And McGrath recommended that Mellace buy AAA-rated student-loan ARS.

McGrath also told Mellace that an ARS auction had failed in August 2007 — a failure, McGrath said, that related to mortgage-backed ARS, a corner of the ARS market in which Tutor Perini would not be investing. McGrath assured Mellace that BAS would support the auctions of BAS-recommended ARS. Mellace ran the ARS-purchase possibility by her bosses (Tutor Perini's chief financial officer and its president), telling them that auctions could possibly fail, in which case Tutor Perini "wouldn't have liquidity" until the next auction — a "daily auction sheet" that McGrath sent Mellace actually mentioned that risk. But because BAS's "interests . . . aligned" with Tutor Perini's (Mellace's words, not ours) — the two had a long-standing relationship, and BAS was the lead bank in the credit agreement — the idea that the ARS would remain illiquid was too "remote [a] possibility" to discuss, though (again) Mellace knew that such a possibility existed.

Mellace's overseers signed off on her investing in ARS, but their okay depended on her investing in "high-quality, short-term securities" — *i.e.*, ARS's with "AA and AAA[]" credit ratings. McGrath knew Mellace was only interested in high-credit-rated ARS. And she knew about Tutor Perini's need for quick liquidity. Anyhow, Tutor Perini finally bought the BAS-endorsed ARS. And after this sale — and the other relevant sales too — BAS sent out trade confirmations directing Tutor Perini to BAS's website, which contained BAS's ARS disclosures saying that it "routinely" bid in auctions, including to prevent failures, but had no obligation to do so.[6]

These student-loan ARS had formulaic — as opposed to fixed — max rates keyed in part to interest-rate indices like the

---

[6] "BAS is permitted, but is not obligated, to submit orders for its own account . . . and routinely does so in its sole discretion," the disclosures read. Also,

> [s]uch bids submitted by BAS may be designed to prevent a Failed Auction . . . ; however, BAS is not obligated to place such a bid in any auction, or to continue to place such bids. . . . Investors should not assume that BAS will place a bid . . . or that Failed Auctions or unfavorable auction rates will not occur.

"BAS is not obligated to make a market in the securities," the disclosures added, "and may discontinue trading in the securities without notice for any reason at any time." Noting that BAS "provides no assurance as to the outcome of any Action," the disclosures cautioned that "there can be no assurance" that a holder will be able "to resell the securities . . . on the terms or at the times desired by the holder." Mellace recalled clicking on the link to that website "once or twice."

earlier-mentioned London Interbank Offered Rate or the Treasury rate. At this time, however, both indices were trending downward (thanks to a weakening economy), while investors were demanding higher interest rates for ARS (because of concerns over the creditworthiness of certain companies that insured various ARS, evidently). The net result is that the space between the ARS max rate and the rates demanded by ARS buyers — referred to by the parties as the "headroom" — shrunk significantly, a phenomenon that suggested that ARS auctions would likely fail if the trend continued. Faced with this grim prospect, many issuers implemented waivers that temporarily raised the max rate for some ARS — "temporarily," because most were set to expire in January 2008.

### (f)
### Lack of Investor Demand

Concerned about the contagion and the possibility of ARS-auction failure triggered by low max-rate caps, BAS started tracking ARS max rates in early October 2007. Noticing a lack of investor demand, BAS also ordered a review of its ARS inventory. No one from BAS discussed this or the then-existing risks with Mellace. But an October 5 *Wall Street Journal* article — titled "Bond Tumult is Jostling Auction-Rate Securities" — did note that "about 60 auctions worth $6 billion didn't find enough buyers in August." Still, McGrath kept recommending ARS to Tutor Perini. That same month, October 2007, McGrath, for example, emailed

Mellace, encouraging her to buy student-loan ARS in BAS's own inventory. Relying on McGrath's advice, Tutor Perini agreed to take several of these ARS off BAS's hands, while knowing (to quote from an internal Tutor Perini memo) that "there is no guarantee that [an ARS] holder [will] be able to liquidate its holdings when desired."

### (g)
### "One Step Away from Illiquidity"

As October turned to November, a senior BAS executive emailed colleagues that "quite a few issues in [the] student loan [ARS] market have come precariously close to failing." BAS did not clue Mellace in on any of this. And McGrath kept touting ARS as sound investments.

Continuing what looks like an effort to reduce its ARS-risk exposure, McGrath emailed Mellace in mid-November that BAS was offering "a lot" of its ARS "inventory" for sale at a "discount." Tutor Perini bought one of those recommended student-loan ARS that same day. A little later, BAS's senior risk manager forwarded his boss a colleague's email warning that "[t]he ARS market is one step away from illiquidity." So BAS continued making support bids to avert auction failure.

Because of BAS's support bids, its ARS inventory swelled to record levels in December. That did not sit well with BAS's risk manager. He felt that the liquidity problems with ARS were

so profound that BAS had to get rid of them, telling BAS staffers that he was "very concerned about our ability to keep the [ARS] programs floating." He had talked with "a lot of" salespersons, he added, and "through tears from one of them" had learned that they were "afraid that their clients are at risk." "ARS are ripe to be the next problem," he ominously declared. And he recommended that BAS hold no "ARS on [its] balance sheet." Another week went by, and the risk manager told colleagues that "[t]he ARS really bother[] me," emphasizing that the "ARS book could get ugly," and warning that "[o]nce we have one failed auction, others will most likely follow." So BAS ordered a "thorough review of max rates on existing book" and told the "banking team" to "focus[]" on "getting max rates adjusted as quickly as possible where needed."

Around mid-to-late December, Fitch Ratings (a major credit-rating agency) issued a press release — carried by *Reuters*, *Dow Jones*, and *Business Wire* — saying that some ARS issuers had gotten "temporary waiver[s]" of their ARS's max rates. Mellace did not recall seeing the report. But BAS personnel did see it. And in response a BAS senior executive asked his colleagues, "[D]o you think we should be doing more active education around this subject with our [corporate investors] who buy student loans? This might help them have a better understanding of the cash flow/credit dynamic." BAS launched no education effort, however. Days after

the report, BAS's risk manager stressed to a coworker how much he "really [didn't] like" the "ARS product" because of the liquidity problem. "When you want out," he observed, "you are [at] the highest risk of not being able to get out!"

With its ARS inventory at sky-high levels, some of BAS's top brass kicked around ways to protect *BAS*. BAS senior executives, for instance, toyed with the idea of letting all ARS auctions founder, laying out a step-by-step process to do this so as to (hopefully) avoid legal liability. They then discussed selectively failing certain auctions instead. They also urged salespersons to "leave no stone unturned" in getting investors — like Tutor Perini — to buy up BAS's ARS. And they continued encouraging issuers to waive max rates.

Despite knowing that the risk/reward calculus for ARS had changed dramatically, BAS disclosed none of these facts to Tutor Perini. McGrath, for example, did not tell Mellace about

- the issues with max rates — that max rates could cause auction failure, that issuers were executing more and more max-rate waivers in the hope of preventing auction failure, *etc.*;

- the extent of broker-dealer support bids, though Mellace did know that BAS made support bids;[7]

---

[7] Tutor Perini's expert said that during the period pertinent to this suit (early 2007 to early 2008), roughly 98% of the ARS

- the record-setting level of ARS in BAS's inventory, plus the swelling of ARS inventories at other broker-dealers;

- the unprecedented number of waivers being sought;

- the dwindling level of investor demand for ARS; or

- the internal BAS discussions to let certain ARS auctions fail.

Instead, McGrath urged Mellace to buy more. By December 2007, Tutor Perini had become one of BAS's biggest buyers of ARS, with about $196 million invested — though it sold off most of its ARS at year's end (it wanted to convert its ARS to cash for year-end-reporting purposes).

### (h)
### "Moving Paper"

On January 2, 2008, McGrath emailed Mellace a list of "featured" ARS offerings. That same day, Tutor Perini bought about $60 million worth of ARS. BAS's short-term trading director updated BAS executives that afternoon on the ongoing efforts to reduce BAS's ARS inventory and highlighted Tutor Perini's purchase. "Perini," he noted, "who was an end of year seller[,] came back in . . . and bought about 60mm." And he added that the "main focus will be to continue moving paper" out of BAS's inventory and onto its customers. The pattern became a script,

---

auctions that BAS participated in would have failed without BAS's support bids.

with BAS's moving more of its ARS inventory onto Tutor Perini throughout that month.  On January 7, for example, McGrath emailed another ARS recommendation to Mellace, saying that "these are available for CASH settle today," though "[i]nventory seems to be thinning."  Mellace bought some that very day.  Two days later, on January 9, McGrath again recommended that Mellace buy "featured" ARS offerings.  And again Mellace did just that.

Importantly, at least to BAS, the prospectuses for some of these ARS stated things like:

- "[B]roker-dealers are not obligated to make a market in [ARS], and may discontinue trading in [ARS] without notice for any reason at any time."

- "Broker-Dealers are not obligated to continue to place [auction] bids or encourage other bidders to do so . . . . Investors should not assume that . . . Broker-Dealers will do so or that 'auction failure events' and unfavorable Auction Rates will not occur."

- Auction failures were "especially" likely "if, for any reason, the broker-dealers were unable or unwilling to bid."

- Also, "[t]he relative buying and selling interest of market participants in your [ARS] and in the [ARS] market as a whole will vary over time, and such variations may be affected by, among other things, news relating to the issuer, the

- 18 -

attractiveness of alternative investments, [and] the perceived risk of owning the security (whether related to credit, liquidity or any other risk) . . . ."

- And ARS may be unsuitable investments "if you require a regular or predictable schedule of payments or payment on any specific date."

Unfortunately for all concerned, market conditions went from bad to worse. Among other problems, broker-dealer inventory increased; the headroom between investor-demanded interest rates and max rates continued narrowing; ARS auction failures — including auction failures for student-loan ARS — occurred; and no new ARS investors appeared. McGrath did not tell Mellace about this, however. And on the very day a competing broker-dealer let an auction for AAA-rated student-loan ARS fail, BAS sold almost $30 million worth of AAA-rated student-loan ARS to Tutor Perini. Also, when a higher-up at a BAS affiliate suggested that portfolio managers protect their clients by "begin[ning]" to "eliminat[e] . . . client exposure to [ARS] and refrain[ing] from additional purchases," a BAS ARS trader-desk liaison wrote, "Whoever sent this out should be shot!! Are they trying to put us out of business?" And BAS geared up to implement a plan (conceived in December 2007) to selectively fail auctions.

On February 6, 2008, with the rate of auction failures "crescendoing" — that is how BAS's risk manager described this "crisis" situation — senior BAS executives sent a memo to BAS's chief financial officer seeking permission to up ARS inventory levels so BAS could relieve some of its balance-sheet pressure. Among other things, the memo mentioned the existing state of the market, spotlighting increasing concerns about the ARS market, its liquidity, and the drastic rise in broker-dealer inventories. The memo also stressed that "the key structural issue" — the need to increase max rates — had still not been resolved. BAS management green-lighted an increase, bumping the internally-imposed limit on inventory levels for ARS (and ARS-like securities) from $3 billion to $8 billion. But it was too late.

### (i)
### The Market Crackup

Over the next two days, February 7 and 8, broker-dealers Goldman Sachs and JP Morgan Chase let large numbers of ARS auctions fail — Goldman, for instance, failed several AAA-rated student-loan ARS auctions. BAS personnel called the Goldman failures "unprecedented" and "market changing." BAS's head ARS trader jotted a note to himself that "mgmt. not comfortable std. loan product" — a jotting, he later explained, that referred to BAS's concerns about the student-loan product following the Goldman/JP Morgan failures. Yet even though BAS officials knew these failures

- 20 -

made the ARS market "**nonviable**,"[8] McGrath sold Tutor Perini more ARS on February 8 and 11 (McGrath knew about the Goldman failures because she had emailed her boss about them on February 8).  Also on February 11, the *Wall Street Journal* reported on Goldman's auction failures — Goldman, the article said, had "held auctions of hundreds of millions of dollars in securities backed by student loans, all of which failed to drum up enough demand at their asking prices."  The next day, McGrath told Mellace about the February 7 and 8 failures.  Even though BAS's disclosures stated that BAS could stop supporting auctions at any point and that BAS offers "no assurances" about the outcome of any auction, McGrath told Mellace that BAS still intended to support the auctions.

But then this happened:  all other prominent broker-dealers stopped making their own ARS-purchase bids.  And faced with that reality, BAS did the same thing on February 13.  Auctions for student-loan ARS failed en masse — even BAS withdrew its support from the student-loan ARS market.  Auctions for ARS with formulaic max rates failed big time too.  But the majority of auctions involving ARS with high, fixed max rates generally did not fail.  So BAS's risk manager recommended supporting ARS with max rates greater than 9% and failing all others.  Because the at-

---

[8] We put that word in bold type to make sure no one misses it.

issue ARS were of the formulaic variety, Tutor Perini was left holding "illiquid" investments — its nightmare scenario.

**(j)**
**Off to Federal Court**

Invoking federal-question jurisdiction, see 28 U.S.C. § 1331, Tutor Perini sued BAS and BANA in Massachusetts's federal district court. Pertinently, Tutor Perini's complaint contained counts for federal securities fraud (alleging what are called 10(b)-fraud and 10(b)-unsuitability claims); state securities fraud; state deceptive business practices; as well as state common-law misrepresentation (both negligent and intentional).[9] After some preliminary skirmishing (not relevant here), BAS and BANA moved for summary judgment on all claims, and Tutor Perini cross-moved for partial summary judgment on the state-securities-fraud claim and the state deceptive-business-practices claim. The judge granted BAS and BANA's motion and denied Tutor Perini's (more on the judge's ruling later). A dissatisfied Tutor Perini appeals.

---

[9] We say "pertinently," because Tutor Perini brought other claims (*e.g.*, common-law fraud), but its brief presents argument only on the claims just listed — so obviously Tutor Perini waived any right to challenge the dismissal of the other claims. See generally Rodríguez v. Municipality of San Juan, 659 F.3d 168, 175 (1st Cir. 2011).

- 22 -

## STANDARD OF REVIEW

We approach the judge's summary-judgment ruling *de novo*, viewing (as we intimated earlier) all facts and drawing all reasonable inferences in the light most agreeable to Tutor Perini (the summary-judgment loser). See Collazo-Rosado v. Univ. of P.R., 765 F.3d 86, 89, 92 (1st Cir. 2014). And we will affirm only if the record (so viewed) discloses no genuine dispute over a material fact and reveals BANA's and BAS's entitlement to judgment as a matter of law. See id. at 92. An issue is genuine if a sensible jury could decide the point in Tutor Perini's favor. See Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011). And a fact is material if it has the potential to alter the case's outcome under the applicable law. See id. That each side cross-moved for summary judgment does not warp this line of inquiry: "[b]arring special circumstances, the [judge] must consider each motion separately, drawing inferences against each movant in turn." EEOC v. Steamship Clerks Union, Local 1066, 48 F.3d 594, 603 n.8 (1st Cir. 1995). And ultimately, we may affirm the summary-judgment holding on any grounds supported by the record, even if not relied on by the district judge. See, e.g., Collazo–Rosado, 765 F.3d at 92.

**OUR TAKE ON THE CASE**

Now on to the core issues in play, which — after dealing with the easiest one first — we discuss in the order Tutor Perini chose to present them.

**(a)**
**BANA Stays Out**

Stressing that Tutor Perini failed to identify any misconduct on its part, BANA asked the judge to jettison all claims against it.  Not so fast, said Tutor Perini:  federal and state securities laws "extend liability to control persons," and, the argument continued, BANA is on the hook as a "controlling person," given the actions of two BANA employees and two dual BAS/BANA employees who had "analyzed maximum rate waivers and liquidity risks for deciding which auctions to fail."  Unfazed, BANA shot back that Tutor Perini never pled "federal and state control-person claims . . . in four years of litigation" and could not début those new claims in its summary-judgment submissions.  The judge thought BANA had the better of the argument.  And so do we, because Tutor Perini alleged zero facts indicating that BANA actually exercised control over BAS.  See Aldridge v. A.T. Cross Corp., 284 F.3d 72, 85 (1st Cir. 2002) (emphasizing that "the alleged controlling person must not only have the general power to control the company, but must also actually exercise control over the company").  Seeking a way around that problem, Tutor Perini

now says that BAS needed BANA's blessing to expand its ARS inventory in February 2008 — surely that shows control, Tutor Perini insists. But Tutor Perini waived that point by not bringing it to the district judge's attention, and Tutor Perini makes no argument that any exception to the raise-or-waive rule applies. See, e.g., Ouch v. Fed. Nat'l Mortg. Ass'n, 799 F.3d 62, 67 n.5 (1st Cir. 2015).

With BANA out of the way, we turn to the judge's handling of the claims against BAS.

## (b)
### State Securities-Fraud Claim

Like most states, Massachusetts regulates in-state securities sales and offers "through 'blue sky' laws, so named because they initially targeted swindlers so brazen and so shameless they would peddle shares of anything, including (allegedly) shares of the sky." See Bennett v. Durham, 683 F.3d 734, 736 (6th Cir. 2012) (citing Jonathan R. Macey & Geoffrey P. Miller, Origin of the Blue Sky Laws, 70 Tex. L. Rev. 347, 359–60 & n.59 (1991)). Designed to create "a strong incentive" for securities sellers "to disclose fully all material facts about the security," Marram v. Kobrick Offshore Fund, Ltd., 809 N.E.2d 1017, 1025 (Mass. 2004), Massachusetts's law says that "any person who . . . offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact . . .

- 25 -

is liable to the person buying the security from him."  Mass. Gen. Laws ch. 110A § 410(a)(2).

Simplifying slightly (but without affecting our analysis), we see that to prevail under this statute, a plaintiff must show (1) that the defendant offered or sold securities (2) in the Bay State (3) by (a) making an untrue statement of material fact or (b) omitting a material fact (4) that the plaintiff (a) did not know was false or (b) did not know was omitted and (5) the defendant knew or should have known was untrue or misleading. Marram, 809 N.E.2d at 1026 (discussing Mass. Gen. Laws ch. 110A § 410(a)(2)).  Significantly, the plaintiff need not show either reasonable reliance on its part or a bad mind on the seller's part. See id. at 1026-27.  The plaintiff's sophistication is irrelevant as well.  Id. at 1027.  And the plaintiff has no duty to check the accuracy of the defendant's statements — "[a]ll that is required" is that the plaintiff show its "ignorance of the untruth or omission."  Id. (quoting Sanders v. John Nuveen & Co., 619 F.2d 1222, 1229 (7th Cir. 1980)).[10]

Zeroing in on element (3), the district judge concluded that Tutor Perini "failed to offer evidence that BAS made any

_____

[10] Because state and federal securities-fraud acts are fairly similar, cases interpreting the federal statute can help in interpreting the state statute.  Id. at 1025.

- 26 -

untrue statement of material fact or omitted a material fact that is necessary to make a prior statement not misleading." The parties fight like mad over element (3) too, though they do not clash over the materiality facet of element (3). And each side makes good points. But Tutor Perini is more right than BAS, as we now explain.

BAS thinks that Tutor Perini waived its misrepresentation arguments by not calling them to the judge's attention. For its part, Tutor Perini basically concedes that its memo opposing BANA and BAS's summary-judgment motion did not cite "the many instances of material misstatements," though it sees no problem because "all the relevant facts were fully set forth" in its statement of undisputed facts "in support of its cross-motion for summary judgment." That does not cut it. "Judges," after all, "are not like pigs, hunting for truffles buried in" the record. United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam); accord Rodríguez–Machado v. Shinseki, 700 F.3d 48, 50 (1st Cir. 2012) (per curiam). So BAS is right about the misrepresentation argument being waived. See Ouch, 799 F.3d at 67 n.5 (discussing the raise-it-or-waive-it rule).

The omissions issue is a different matter altogether, however. Tutor Perini's summary-judgment papers sounded a consistent theme — that BAS "failed to disclose" "*material facts*

- 27 -

concerning the current state of the ARS market" when it was peddling ARS to Tutor Perini.  "Having recommended the ARS," Tutor Perini wrote, "having provided boilerplate disclosures, having presented ARS as a good short-term investment vehicle in person and in writing, having provided information about the state and liquidity of the ARS market[,] and having discussed specific ARS with Tutor Perini on a daily basis, BAS was duty bound" not to omit key facts.  And it is to that preserved argument that we now turn.

### (1)
### Presence of Trialworthy Issues

Omissions are failures to speak, at least in the context of this case.  See *Omission*, Black's Law Dictionary (10th ed. 2014).  Examples of omissions include a speaker's not speaking when she has a duty to speak, or speaking misleading half-truths — *i.e.*, offering truthful comments but omitting unfavorable info. See, e.g., Nei v. Burley, 446 N.E.2d 674, 676 (Mass. 1983); Kannavos v. Annino, 247 N.E.2d 708, 711-12 (Mass. 1969).  Tutor Perini's briefs to us talk a lot about the different sources of disclosure duties that it has in mind.[11]  But we limit our review

---

[11] Tutor Perini, for example, says that a rule put out by something called the "Municipal Securities Rulemaking Board" creates an independent disclosure duty.  This argument never surfaced in the district court.  And having been given no reason

- 28 -

to what it argued below, and basically repeats here:  "This case,"
Tutor Perini told the district judge,

> is about whether BAS omitted to state material facts it
> knew about the ARS market at the time BAS was
> specifically recommending [and selling] ARS . . . to
> Tutor Perini and was talking to and writing to Tutor
> Perini every day to provide it with information about
> the ARS.

Given that BAS spoke, it had "a duty to be complete and accurate"
— or so Tutor Perini insisted, and still insists.[12]

The parties basically agree that BAS made specific
investment recommendations to Tutor Perini.  Below, Mellace flat-
out said in her affidavit that she "followed Lois McGrath's
recommendations when purchasing ARS on behalf of Tutor Perini."
All of this recommendation stuff is significant because even though
Tutor Perini had a nondiscretionary-investment account, BAS could

---

to relax our raise-or-waive rule here, we deem it waived.  See,
e.g., Ouch, 799 F.3d at 67 n.5.

[12] A quick heads-up:  As part of the duty analysis, we need
not concern ourselves with McGrath's assurances to Mellace that
BAS would continue to support the ARS auctions.  And that is
because Tutor Perini's opening brief concedes that its "claims are
not based upon reliance" on BAS's auction-support "promise,"
despite McGrath's "specific representation to Mellace . . . the
day before BAS withdrew its support for virtually all formulaic
ARS" — instead, Tutor Perini basically bottoms its claims (as it
did below) on "the fact that BAS" possessed "material facts about
the then-existing state of the market, including its own internal
discussions to fail auctions, that should have been disclosed to
[Tutor Perini] so that [Tutor Perini] could have been aware of the
state of market and would have known, as BAS knew, that the market
was on the verge of collapse at the very time BAS was urging [Tutor
Perini] to buy ARS."

- 29 -

only suggest a security after "studying it sufficiently to become informed as to its nature, price, and financial prognosis." See Patsos v. First Albany Corp., 741 N.E.2d 841, 849-50 n.15 (Mass. 2001). Also, BAS had to "inform" Tutor Perini "of the risks involved in purchasing or selling [that] security." See id. And BAS's affirmative assurance that it would "clearly defin[e] the risk/reward of particular securities" discredits any notion that it could point Tutor Perini toward additional ARS purchases even as the risks dramatically changed without alerting Tutor Perini to those dramatic changes.[13]

---

[13] Here's a refresher on some of the dramatic changes:

- In November 2007, a BAS officer concluded that "[t]he ARS market is one step away from illiquidity."

- Convinced that "ARS are ripe to be the next problem" — BAS's risk manager told a colleague in December that "[o]nce we have one failed auction, others will most likely follow." Also that month, BAS — fretting about its ballooning ARS inventory (which was at an all-time high) — ordered that "no stone" be left "unturned" in getting investors to gobble up BAS's ARS. And BAS continued pressing ARS issuers to waive max rates so as to make the ARS market appear less risky to investors.

- As the calendar flipped, BAS heard that Lehman Brothers let several ARS auctions go kaput in late January 2008 — at or very near the time that BAS offloaded the ARS at issue to Tutor Perini. Deeply troubled by these failures, a BAS affiliate urged its mangers to protect clients by getting out of the ARS market. BAS did no such thing (at least BAS has pointed us to nothing in record that it did) — what BAS did do, though, was set in motion a plan (hatched a month earlier) to selectively fail auctions. But the market's death spiral accelerated, with other broker-dealers letting auctions fail days later, including an auction involving AAA-rated student-

Viewed against this legal backdrop, we think that the record — considered afresh, and in the light most flattering to Tutor Perini — reveals trialworthy issues on Tutor Perini's state securities-fraud claim, making summary judgment on that claim inappropriate. Without expressing our own views on the issues, we believe a reasonable jury could find the following:

- In convincing Tutor Perini to buy ARS, BAS's McGrath expressly told Tutor Perini's Mellace that BAS would provide "investment solutions that meet your needs by clearly defining the risk/reward of particular securities . . . ."

- Tutor Perini bought the ARS at issue here in January and February 2008 because BAS had recommended that Tutor Perini buy them.[14]

---

loan ARS — a failure that occurred on the very day BAS sold Tutor Perini roughly $30 million of *AAA-rated student-loan ARS*.

- On February 7, Goldman Sachs let a bunch of ARS auctions fail — a "market changing event," to quote a person in the know at BAS. J.P. Morgan let more auctions fail the day after that. BAS disclosed none of this to Tutor Perini, however. And even though BAS management knew the market had become "nonviable," McGrath continued selling ARS to Tutor Perini.

[14] The parties quibble over the exact number of ARS at issue — Tutor Perini says it is 14; BAS says it is 8. But neither side explains why that matters for our purposes. So we say no more about that subject.

- But the ARS's risk/reward had materially and dramatically changed such that by January 1 or, alternatively, by February 7, BAS's risk/reward description to Tutor Perini no longer — thanks to BAS's omissions — accurately and clearly defined the actual risk/reward as McGrath pushed the at-issue ARS on Mellace.

On this record — seen from a Tutor-Perini-friendly perspective — a sensible jury could conclude that some or all of Tutor Perini's 2008 ARS buys were the product of prior risk/reward assessments that remained alive yet over time became inaccurate because BAS failed to reveal new, highly material developments that it knew of as McGrath steered Mellace to the at-issue ARS. Compare generally Patsos, 741 N.E.2d at 849-50 n.15 (emphasizing that a broker handling nondiscretionary accounts has a "duty to inform the customer of the risks involved in purchasing or selling a particular security"), with Backman v. Polaroid Corp., 910 F.2d 10, 16 (1st Cir. 1990) (en banc) (noting that "a voluntary disclosure of information that a reasonable investor would consider material must be 'complete and accurate'" — a concept that means that one must reveal "such other[]" information that is "needed so that what was revealed [will] not be 'so incomplete as to mislead'" (quoting SEC v. Tex. Gulf Sulphur Co., 401 F.2d 833, 862 (2d Cir. 1968))).

Further strengthening our conviction on this score, we believe that a rational jury could view the evidence as indicating that Tutor Perini's 2008 ARS purchases were simply replacing ARS that it had sold just before the end of 2007: after all, Tutor Perini did not want the ARS on its balance sheet at year's end, and BAS knew of this plan. These facts could give a rational jury all the more reason to infer that BAS's late-2007 representations — that ARS were "better" than Tutor Perini's other investment options and that it was "a good time" to invest in ARS, for example — carried over to its early 2008 ARS purchases. Given that the circumstances had changed, arguably materially so, a rational jury could find that BAS was required to supplement its previous recommendations lest they be inaccurate by way of being incomplete.

### *(2)*
### *Absence of any Winning BAS Counterarguments*

Undaunted, BAS raises a host of arguments for why we should affirm the summary judgment on the state securities-fraud claim. Though skillfully presented by talented counsel, none of BAS's contentions persuades.

On the duty question, BAS notes that while "a voluntary disclosure of information that a reasonable investor would consider material must be 'complete and accurate,'" that "does not mean that by revealing one fact . . . , one must reveal all others that, too, would be interesting, market-wise." Backman, 910 F.2d

- 33 -

at 16 (quoting <u>Roeder</u> v. <u>Alpha Indus., Inc.</u>, 814 F.2d 22, 26 (1st Cir. 1987)).  True, but what BAS overlooks is that the law — as we noted in an earlier case parenthetical — requires one to disclose "such other[]" facts "that are needed so that what was revealed would not be 'so incomplete as to mislead.'"  <u>Id.</u> (quoting <u>Tex. Gulf Sulphur Co.</u>, 401 F.2d at 862).  And here, a jury could find that BAS acquired info that caused it to be desperate to sell all of its own ARS, yet it kept that info to itself when recommending that Tutor Perini buy ARS.

Moving on, BAS implies that the February 2008 collapse occurred suddenly, so suddenly that it had no idea the market would crumble — something that is inferable from its just-before-the-crash decision to raise the limit (from $3 billion to $8 billion) on the amount of ARS it could hold on its balance sheet.  If BAS thought the market was about to go belly-up, the argument goes, it wouldn't have authorized the increase — an action that showed (to quote its brief) that BAS was simply "trying to keep the auctions going in the hope of weathering the storm."  But the problem for BAS is that other evidence cuts against any suddenness inference: BAS, don't forget, saw danger signs aplenty well before the collapse, as shown by its

- talking internally about a "contagion" in summer 2007;

- knowing broker-dealers (including itself) had massive, unsustainable ARS inventories as events dragged into 2008, inventories that were causing them to lose the ability to make all-important support bids; and

- realizing the ARS market was "one step away from illiquidity" near the end of 2007.

We could go on and on, but you get the idea. As for BAS's storm-weathering metaphor, a levelheaded jury could conclude that BAS knew perfectly well that it and other broker-dealers were in the midst of a transcendently-awful financial storm, with disaster looming — yet BAS concealed the storm's existence from Tutor Perini. And because this suddenness matter is "open to reasonable dispute," it is "not the stuff of summary judgment." See Mason v. Telefunken Semiconductors Am., LLC, 797 F.3d 33, 41 (1st Cir. 2015).

BAS also faults Tutor Perini for not divining the problems with the ARS market on its own. To that we say this: A rational jury could find that Mellace did not have a clear picture of the market's actual state, which is why she relied so much on McGrath. And whether she should have ignored what McGrath said and done her own research matters not one bit because Massachusetts's Blue Sky law imposes no such obligation on investors. See Marram, 809 N.E.2d at 1027 (noting that a buyer

- 35 -

has no "duty to investigate," emphasizing instead that "[t]he buyer needs only to show 'lack of knowledge of a misleading statement or omission'" to carry the day (quoting Mid-Am. Fed. Sav. & Loan Ass'n v. Shearson/Am. Express Inc., 886 F.2d 1249, 1254 (10th Cir. 1989))).

Wait a minute, says BAS: Mellace knew of auction failures "before" it chose to buy ARS back in September 2007, courtesy of a chat with McGrath at that time. But Mellace swore in an affidavit that McGrath only mentioned one auction failure then — a failure, McGrath added, that involved mortgage-backed ARS, an area of the market in which Tutor Perini would not be investing its money. BAS tries to downplay this fact by talking up an August 2007 email sent to Tutor Perini's president discussing several fizzled auctions. But this is not a winning strategy. The president said he did not read the email (he gets bombarded with — and ignores — unsolicited missives like this one all the time, he added). And BAS points to no evidence indicating that any Tutor Perini personnel ever read that email. At best for BAS, the email raises a question of fact about Tutor Perini's knowledge, and so summary judgment cannot be used to resolve it. See, e.g., Cortés-Irizarry v. Corporación Insular de Seguros, 111 F.3d 184, 190 (1st Cir. 1997).

Staying with auction failures, BAS writes that different news outlets reported on some between August 2007 and February 2008. Repeating that Massachusetts imposes no duty on an investor to investigate or verify the accuracy of a seller's statements, see Marram, 809 N.E.2d at 1027, we note that Mellace said that she did not know about auction failures (other than the one auction failure in August 2007, of course) until McGrath fessed up to them in February 2008 — *after* Tutor Perini had bought the ARS at issue. Yes, McGrath did send Mellace articles discussing the credit problems of some monoline insurers. But other summary-judgment evidence indicates that McGrath never told Mellace whether or how the monoline insurers' credit woes might impact Tutor Perini's ARS investments. On top of this, still other evidence suggests that the February 2008 collapse had nothing to do with insurance — rather, it had to do with the fact that bidding rates for variable ARS (whether insured or not) were going up while max rates were going down. And additional evidence reveals that Mellace never knew about this structural problem. BAS also talks about the December 2007 press release that Fitch Ratings put out — you know, the one that discussed how some ARS issuers had obtained temporary max-rate waivers. Well, Mellace had no memory of seeing that report. So what we have, again, are controversies of fact that cannot be resolved through summary judgment. See Cortés-Irizarry,

111 F.3d at 190. More importantly, to the extent BAS still thinks the August 2007 auction breakdown gives it a silver-bullet defense, we stress that the issue here is not Tutor Perini's knowledge in August 2007 — it is Tutor Perini's knowledge in January and February 2008, when the significant events occurred.

Also missing the mark is BAS's argument that Tutor Perini had access to two key things: (1) info regarding the max rates for the at-issue ARS — all it had to do, BAS writes, was review sent-out prospectuses and Excel spreadsheets, or ask BAS for the max rates; plus (2) info concerning BAS's ARS-inventory levels — all it had to do, BAS insists, was take emailed Excel files reflecting the par amount of ARS held in BAS's inventory and then use Excel's "auto-sum" feature to calculate BAS's ARS-inventory level for any particular day. As for part (1) of BAS's argument, other evidence shows BAS personnel knew that max rates were "hard to figure out" and "understand" (even for financial advisors), and that one could not calculate the max rate simply by reading prospectuses. Additionally, the prospectuses said zip about what was actually happening in the market (*e.g.*, that issuers continuously needed to waive max rates to prevent auction failures). And other evidence indicates the spreadsheets were out of date, having been created in December 2006 (months before Tutor Perini bought any ARS). As for part (2) of BAS's argument, other

evidence also suggests BAS sometimes sent outdated, inaccurate, and incomplete inventory indicators.  The net result is these issues are for a jury to sort out, not a judge on summary judgment. See Cortés-Irizarry, 111 F.3d at 190.

And contrary to what BAS argues, its PowerPoint presentation (which noted that ARS auctions could "fail") and its disclosures on its public website (which say that BAS "routinely" bids in ARS auctions, including to keep auctions from failing, but isn't obliged to) do not change our decision.[15]  Here is why.

Tutor Perini essentially concedes it knew that BAS could theoretically stop supporting ARS auctions and that ARS auctions could theoretically fail.  And BAS essentially concedes it would have to reveal current-market facts in what is called "the classic 'Grand Canyon'" situation — *i.e.*, a situation where the broker-dealer makes risk disclosures that, given the market's state, are akin to a hiker "warn[ing] his . . . companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away."  See In re Prudential Sec. Inc. Ltd. P'ships Litig., 930 F. Supp. 68, 72 (S.D.N.Y. 1996) (quotation marks omitted).  Basically, the fight

_____

[15]  For anyone interested in re-reading the website disclosures, turn back to footnote 6 above.

is over whether a jury could rationally find that this is that Grand-Canyon situation.

Our caselaw — as BAS is quick to note — says that when a defendant "specifically . . . disclose[s]" a risk, "[t]o the extent that the plaintiff's complaint is that the precise degree of risk was not stated, that failure is not sufficient to have rendered the statements misleading."  See Hill v. Gozani, 638 F.3d 40, 60 (1st Cir. 2011) (emphasis omitted).  BAS flashes Hill around like a trump card, insisting that because it disclosed the possible risks of auction failure and support-bid withdrawal, it did not have to identify the degree of risk.  But try as it might, BAS can take no comfort from Hill.

Hill made several points directly applicable here.  It noted that "[a] statement of risk does not insulate the speaker from liability, particularly where it is 'generic and formulaic.'" Id. (quoting Lormand v. U.S. Unwired, Inc., 565 F.3d 228, 245 (5th Cir. 2009)).  It noted that "[a] statement that discloses a level of risk may be so understated as to be misleading."  Id.  And it noted that a defendant could be on the hook for downplaying a "near-certain[]" risk, id. at 59 — a concept that calls to mind the Grand-Canyon scenario, where a defendant sees "disaster looming on the horizon" but opts to whitewash reality, see id. at 58.

Applying those principles, we — after considering the aggregate record facts in the light most sympathetic to Tutor Perini — believe a rational jury could conclude BAS knew (but elected not to disclose) that the ARS market teetered on the brink of collapse when it encouraged Tutor Perini to snatch up more ARS. That BAS specifically pushed ARS on Tutor Perini in winter 2007-08 — despite (a) fearing the market was "one step away from illiquidity," (b) knowing an auction for the same type of ARS had recently flopped, and (c) realizing the market was "nonviable" — surely suggest as much (those are but a few of the many danger signs discussed above).[16] Put slightly differently:  viewing the facts from the required perspective, a reasonable jury could find that while BAS was taking steps to protect itself, it urged an unsuspecting Tutor Perini to walk right off the cliff.  Certainly the question of whether these facts put the parties in the Grand-Canyon situation should go to the jury.  And that kiboshes BAS's Hill-based arguments.  See generally Dow Corning Corp. v. Merrill

_____

[16] On the BAS-pushed-ARS point, please bear in mind Mellace's affidavit testimony that she "followed" McGrath's "recommendation" when buying ARS for Tutor Perini — testimony from which a reasonable jury could find a connection between BAS's communications to Tutor Perini and Tutor Perini's purchase of the at-issue ARS.  So taking as true Tutor Perini's version of the facts as we must, this is not a case where Mellace simply contacted McGrath to buy the at-issue ARS.  Rather, the summary-judgment evidence indicates Mellace bought the at-issue ARS on *McGrath's recommendation*.

Lynch & Co. (In re Merrill Lynch Auction Rate Sec. Litig.), No. 09 MD 2030(LAP), 2011 WL 1330847, at *8 (S.D.N.Y. Mar. 2011) (collecting caselaw recognizing that a defendant cannot "rely on a generic disclaimer in order to avoid liability" when it is "aware of an actual danger or cause for concern" (quotation marks and emphasis omitted)); Dow Corning Corp. v. BB&T Corp., No. 09-5637 (FSH)(PS), 2010 WL 4860354, at *12 (D.N.J. Nov. 23, 2010) (rejecting defendants' bid to rely on (among other things) news articles and prospectuses that "publicized the risk that auctions might fail and the practice of brokers to submit support bids to prevent auction failures — the very facts supposedly concealed by defendants," an outcome reached because the documents "did not inform plaintiffs" of existing market facts).[17]

BAS's reliance on Backman is equally misplaced. There, the Polaroid Corporation had disclosed a current market fact — that it was selling its Polavision cameras below cost. 910 F.2d at 16. And, we said, having done so, Polaroid's disclosure "was not misleading by reason of not saying how much below." Id. Still, we added, "if management knew . . . that Polavision was a

---

[17] BAS tries to minimize the significance of these cases by suggesting that they involved only misrepresentations. Not so — the two involved omissions too. See In re Merrill Lynch Auction Rate Sec. Litig., 2011 WL 1330847, at *4-5; Dow Corning Corp., 2010 WL 4860354, at *2, *8, *11-12.

commercial failure, to say simply that its earnings were negative might well be found to be a material misrepresentation by half-truth and incompleteness."  Id.; see also Carpri Optics Profit Sharing v. Dig. Equip. Corp., 950 F.2d 5, 8 (1st Cir. 1991) (noting how Polaroid could have come out differently "if defendant's apprehension was of a disaster").  Today's case involves precisely that — BAS knew about an impending disaster (or so a logical jury could deduce) and, hoping to escape liability, now plays up boilerplate disclosures that did not jibe with then-existing market facts.

Noting that we can affirm on an alternative ground supported by the record, BAS tries to save its summary-judgment victory here by arguing that Massachusetts's Blue Sky law applies only to initial public offerings — not to private, secondary sales, like those that happened here.  Its argument works in four steps.

1. Quoting Marram, BAS emphasizes how section 410(a) of the state's Blue Sky law "is almost identical with" section 12(2) of the Federal Securities Act of 1933, see 809 N.E.2d at 1025:  refined to their essentials, the former act creates a remedy against "[a]ny person who . . . offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact," see Mass. Gen. Laws ch. 110A § 410(a)(2), while the latter

act creates a remedy against any person who "offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact," see 15 U.S.C. § 77*l*(a)(2).

2. A prospectus "is a term of art referring to a document that describes a *public* offering of securities by an issuer or controlling shareholder" — a fact, BAS reminds us, that led the Supreme Court to conclude that the federal statute is limited to public offerings. See Gustafson v. Alloyd Co., 513 U.S. 561, 575-76, 584 (1995) (emphasis added).

3. Again quoting Marram, BAS points out that courts must "interpret" the Massachusetts statute "in coordination with" the federal statute. See 809 N.E.2d at 1025.

4. And interpreting the acts in the same manner requires us to hold that, like the federal act, the state act does not apply to secondary-market sales — at least that is what BAS thinks.

We think not. BAS is right that courts should look to federal-act caselaw in interpreting the state act. See id. But courts must look to the state act's "plain language" too. See id. And unlike the federal act, the state act has no limiting "prospectus" language and so is not likewise limited — Marram proves the point

(at least implicitly) by characterizing the sale of shares at issue there as a private offering, yet holding that the plaintiff had a cause of action under the Commonwealth's Blue Sky law. See id. at 1022-24, 1028-30; see also Marram v. Kobrick Offshore Fund, Ltd., Nos. 01-2815-BLS1, 05-0672-BLS1, 2009 WL 1015557, at *6-7 (Mass. Super. Ct. Jan. 30, 2009) (reading Marram that way too). All of that makes us comfortable with rejecting this aspect of BAS's affirmance argument — as does this: the uniform blue sky act on which the Massachusetts act is modeled applies regardless of "whether the sale is public or private, primary or secondary." 12A Joseph C. Long et al., Blue Sky Law § 9:1 (2016); see generally Marram, 809 N.E.2d at 1025 (looking to that treatise for guidance).

### (3)
### *Summing Up*

Because the state securities-fraud claim turns on fact questions — the matter is not "so one-sided that one party must prevail as a matter of law," see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) — Tutor Perini is entitled to a jury's decision on that claim.

### (c)
### Federal Securities-Fraud Claim

That takes us to Tutor Perini's federal-securities-fraud claim — premised in part on allegations that BAS made material misrepresentations or omissions concerning the risks of ARS

- 45 -

investing,[18] and in part on allegations that BAS knowingly recommended unsuitable investments, unsuitable because ARS did not fit Tutor Perini's investment needs.  Sparring with BAS, Tutor Perini contends that the judge stumbled in kicking each claim out on summary judgment.  Tutor Perini is only half right, we rightly hold.

## *(1)*
### *Omissions*

To succeed on its omissions-based claim Tutor Perini must prove the following elements:  "(1) a material . . . omission; (2) scienter, or a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation."  See Okla. Firefighters Pension & Ret. Sys. v. Smith & Wesson Holding Corp. (In re Smith & Wesson Holding Corp. Sec. Litig.), 669 F.3d 68, 73 (1st Cir. 2012).  After ticking off the list of fought-over omissions,[19] the judge homed

_____

[18] We will focus on — and limit our attention to — omissions because, as we have already seen, Tutor Perini waived any misrepresentation-based theory.

[19] "Tutor Perini," the judge wrote, insists

that BAS concealed 1) the frequency of auction-support bids, 2) its rising ARS inventory, 3) the maximum rates of the [at-issue ARS] and the difference between those rates and the [ARS's] clearing rates, 4) that [student loan ARS] issuers obtained maximum-rate waivers, 5) other ARS auction failures between August, 2007 and February, 2008 and 6) its alleged mid-December, 2007 contingency plan to allow auctions to fail selectively.

- 46 -

in on elements (1) and (4).  On element (1), the judge concluded that the complained-about omissions were either disclosed in BAS documents or in publicly available material.  See generally Cellular S., Inc. v. J.P. Morgan Sec., Inc. (In re JP Morgan Auction Rate Sec. (ARS) Mktg. Litig.), Nos. 10 MD 2157 (PGG), 10 Civ. 4552 (PGG), 2014 WL 4953554, at *17 (S.D.N.Y. Sept. 30, 2014) (emphasizing "there can be no omission where the allegedly omitted facts are disclosed" (quotations omitted)).  On element (4), the judge held that because BAS had "accurately" disclosed the risk of auction failure, it had no duty to say anything more than it did. And so the judge ruled that Tutor Perini could not invoke any presumption of reliance — because "[i]t is hard to conceive of 'relying' on omitted information," which is why the Supreme Court "devised" a rebuttable "'presumption' of reliance," see Eckstein v. Balcor Film Inv'rs, 58 F.3d 1162, 1171 (7th Cir. 1995), a presumption that applies "if there is an omission of a material fact by one with a *duty to disclose*," see Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc., 552 U.S. 148, 159 (2008) (emphasis added).

The parties battle hard over elements (1) and (4), with Tutor Perini rejecting and BAS defending the judge's analysis. Following their lead, we train our sights exclusively on those elements.  And we again side with Tutor Perini.

- 47 -

Regarding BAS's principal argument — that it accurately disclosed the info Tutor Perini says was omitted, and thus had zero duty to say anything else — we find the contention no more persuasive now than it was a few pages ago:  simply flash back to our earlier discussion of how evidence in the summary-judgment record suggests, one, that the prospectuses, Excel spreadsheets and files, and news articles that BAS talks about were out of date, inaccurate, or not particularly helpful in understanding the then-current state of the ARS market; and, two, that the case fits the Grand-Canyon scenario.  So the rebuttable-reliance presumption applies.  See id.  Reliance is usually a jury issue, unless the summary-judgment evidence "tips the scale only in *one direction*." Kennedy v. Josephthal & Co., 814 F.2d 798, 804 (1st Cir. 1987) (emphasis added).[20]  And the usual rule, not the exception, applies here.[21]

---

[20] See, e.g., In re Eugenia VI Venture Holdings, Ltd. Litig., 649 F. Supp. 2d 105, 119 (S.D.N.Y. 2008) (holding that "[t]he question of whether a party's reliance was reasonable is always nettlesome because it is so fact-intensive, and ordinarily a question of fact to be determined at trial" (quotations and citations omitted)), aff'd sub nom. Eugenia VI Venture Holdings, Ltd. v. Glaser, 370 F. App'x 197 (2d Cir. 2010).

[21] Check out Josephthal & Co. for a nonexhaustive list of factors helpful in making a reliance determination — factors that include "[t]he sophistication and expertise of the plaintiff in financial and securities matters" and "the existence of long standing business or personal relationships."  814 F.2d at 804 (quoting Zobrist v. Coal-X Inc., 708 F.2d 1511, 1516 (10th Cir. 1983)).

Enough said on that.

*(2)*
*Unsuitability*

Broadly speaking, an unsuitability claim requires that a plaintiff "show that the defendant is responsible for some misrepresentation or material omission," see Lefkowitz v. Smith Barney, Harris Upham & Co., 804 F.2d 154, 155 (1st Cir. 1986) (per curiam), and that "the quality of" the securities "bought was inappropriate to [its] investment objectives," see Tiernan v. Blyth, Eastman, Dillon & Co., 719 F.2d 1, 5 (1st Cir. 1983) (emphasis omitted).  In rejecting Tutor Perini's unsuitability claim, the district judge reached three conclusions.  One, the judge said that the BAS-provided prospectuses — mentioning (as they do) how ARS may be unsuitable "if you require a regular or predictable schedule of payments" — wrecked Tutor Perini's unsuitability claim. Two, the judge — taking a belt-and-suspenders approach — added that because he had "already concluded, as a matter of law, that BAS did not make material misrepresentations or breach a duty to disclose material facts," Tutor Perini's unsuitability claim had no oomph.  And three, citing and quoting a Seventh Circuit case — Associated Randall Bank v. Griffin, Kubik, Stephens & Thompson, Inc., 3 F.3d 208, 212 (7th Cir. 1993) — the judge stressed that Tutor Perini's "suitability claim may be barred

- 49 -

because [it] held a non-discretionary brokerage account whereby it directed all the investments made."[22]

Tutor Perini says that this aspect of the judge's summary-judgment ruling is wrong from beginning to end. BAS begs to differ. For our part, we see an obstacle that Tutor Perini cannot surmount.

Even granting (without deciding) that the judge missed the boat with conclusions one and two, we see that Tutor Perini must still deal with conclusion three — *i.e.*, that investor-directed securities transactions cannot support an unsuitability claim, a conclusion BAS fights tooth and nail to defend in its appellee's brief. But the difficulty for Tutor Perini is as BAS argues: Tutor Perini "cites no authority" to support its view (contrary to the judge's and BAS's) that nondiscretionary account holders can bring unsuitability claims. Tutor Perini's reply brief never challenges BAS's "cites no authority" point, incidentally.

---

[22] Discussing Wisconsin law, <u>Associated Randall Bank</u> observed that

> [f]ederal securities law also requires brokers and dealers acting as agents to procure "suitable" securities. But federal law requires this only when the agents exercise discretion over the accounts. Customer-directed transactions fall outside the "suitability" requirement — especially if the agent provides the customer with a prospectus or comparable information.

<u>Id.</u> (citing <u>Brown</u> v. <u>E.F. Hutton Grp., Inc.</u>, 991 F.2d 1020 (2d Cir. 1993)).

Nor do Tutor Perini's appellate papers offer any convincing explanation of what the law should be, assuming it found no on-point authority. What we have from Tutor Perini, then, "is hardly a serious treatment of a complex issue," see Tayag v. Lahey Clinic Hosp., Inc., 632 F.3d 788, 792 (1st Cir. 2011) — "certainly not when" its "'brief presents a passel'" of other protests, see Rodríguez, 659 F.3d at 176 (quoting Dunkel, 927 F.2d at 956). It is not our job to do Tutor Perini's work for it. See United States v. Sepúlveda-Hernández, 817 F.3d 30, 34 (1st Cir. 2016). The bottom line is that Tutor Perini waived any objection to the alternative ground — a.k.a., conclusion three — for upholding the judge's no-unsuitability-claim edict. See, e.g., Medina-Rivera v. MVM, Inc., 713 F.3d 132, 140-41 (1st Cir. 2013); Muñiz v. Rovira, 373 F.3d 1, 8 (1st Cir. 2004); Town of Norwood v. Fed. Energy Regulatory Comm'n, 202 F.3d 392, 405 (1st Cir. 2000).

**(d)**
**State Misrepresentation Claims — Negligent and Intentional**

Granting BAS summary judgment on Tutor Perini's claims for negligent and intentional misrepresentation, the judge ruled that Tutor Perini neither "respond[ed] to [BAS's] arguments refuting the allegations of misrepresentation" nor "identif[ied] any false statements made by BAS." As for the parties' dispute about the judge's ruling, we need only say this much: Tutor Perini correctly cites a case holding that a negligent-misrepresentation

- 51 -

claim under Massachusetts law can be based on omissions.  See First Marblehead Corp. v. House, 473 F.3d 1, 9 (1st Cir. 2006).[23]  And as we have been at pains to stress, the summary-judgment evidence shows triable issues of fact exist over BAS's omissions — omissions that the judge did not consider in reviewing Tutor Perini's negligent-misrepresentation claim.  So the entry of summary judgment on that claim cannot stand.

But the same cannot be said about Tutor Perini's intentional-misrepresentation claim.  For though a heading in Tutor Perini's opening brief suggests the judge erred in dismissing the intentional-misrepresentation claim, its appellate papers never explain how this is so.  And thus Tutor Perini waived any argument it might have on that claim.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (stressing that "[i]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work"); see also

---

[23] To get anywhere on a negligent-misrepresentation claim under Bay State law, a plaintiff "must show" that the defendant

> (1) in the course of [its] business, (2) supplie[d] false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance on the information, and (6) with failure to exercise reasonable care or competence in obtaining or communicating the information.

Id. (quoting Nota Constr. Corp. v. Keyes Assocs., 694 N.E.2d 401, 405 (Mass. App. Ct. 1998)).

- 52 -

Rodríguez, 659 F.3d at 175 (emphasizing that "claims not made" and claims "'confusingly constructed and lacking in coherence'" are deemed waived too (quoting United States v. Eirby, 515 F.3d 31, 36 n.4 (1st Cir. 2008))).

One last issue, and we can call it quits.

**(e)**
**State Unfair-Business-Practices Claim**

A Massachusetts statute creates a cause of action — commonly called a "Chapter 93A claim" — for any business entity injured by "an unfair or deceptive act or practice" by another business entity. See Mass. Gen. Laws ch. 93A, § 11. Because he had tossed out Tutor Perini's securities-fraud claims, the judge believed he had to toss out Tutor Perini's Chapter 93A claim too — in other words, because he found BAS had made no material omissions (and thus had not acted unfairly or deceptively), the judge (at least implicitly) reasoned that Tutor Perini's Chapter 93A claim could not survive summary judgment either. The parties bicker a bit about the judge's handling of this claim. But having rejected the reasoning underpinning the judge's ruling here — we see trialworthy issues on the securities-fraud-by-omission claims, after all — his stated basis for the entry of summary judgment on the Chapter 93A claim evaporates.

**FINAL WORDS**

With that and at long last, we vacate the summary judgment for BAS on the state securities-fraud claim (dealing with material omissions), the federal securities-fraud claim (ditto), the state negligent-misrepresentation claim (ditto), and the state unfair-business-practices claim (ditto).  We affirm in all other respects.  In so ruling, we intimate no view on the outcome of any trial — we have construed the record as favorably to Tutor Perini as we could, and we know that a trial might cast the facts in a different light.  To this we must add, though, that BAS did move for summary judgment on alternative grounds — *e.g.*, scienter, loss causation — that the judge never ruled on.  And of course the parties and the judge are free to take up those yet unexplored grounds on remand.

*Affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion, with no costs to either side.*